# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-1450, 05-1596, 05-2914, 05-3022

SYNFUEL TECHNOLOGIES, INC.,

*Plaintiff-Appellee,*

*v.*

DHL EXPRESS (USA), INC.,

*Defendant-Appellee,*

APPEALS OF:

KEARNEY D. HUTSLER, P.C.,
*et al.*, JOEL M. SHAPIRO, and
W. ANDREW HOFFMAN, *et al.*,

*Objectors-Appellants,*

*and*

CROSS-APPEAL OF:

KOREIN TILLERY,

*Cross-Appellant.*

---

Appeals from the United States District Court
for the Southern District of Illinois.
No. 3:02-CV-00324—**David R. Herndon**, *Judge.*

---

ARGUED NOVEMBER 28, 2005—DECIDED SEPTEMBER 11, 2006

---

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Airborne Express, Inc. (now known as DHL Express (USA), Inc., but referred to as "Airborne"

throughout this opinion) is in the business of delivering packages. In 2002, Synfuel Technologies, Inc., filed this lawsuit on behalf of itself and other Airborne customers claiming that the shipper's practice of charging customers a five pound default rate if they failed to identify the weight of their package violated federal common law. After the district court denied Airborne's motion to dismiss, the company decided to come to the table. A settlement worked out by the parties proposed to compensate class members with up to four pre-paid Airborne shipping envelopes or $30 in cash and to require Airborne to make changes to its billing practices. Several class members filed objections to the settlement, maintaining, among other things, that the compensation provided to class members was nominal. Nevertheless, after a hearing, the district court approved the settlement and awarded class counsel over $600,000 in attorneys' fees.

Several objectors filed appeals. All the objectors argue that the district court lacked jurisdiction over this suit. Objectors Kearney D. Hutsler, P.C., and Thompson, Hutsler & Carson (the "Hutsler objectors") additionally contend that the settlement is unfair to the class members. Objector Joel Shapiro argues that the settlement notice approved by the district court was insufficient. Objectors W. Andrew Hoffman of the Hoffman Legal Group, Pritchard, McCall & Jones, LLC, Professional Asset Strategies, Inc., Asset Strategies, Inc., and N. Albert Bacharach, Jr. (the "Hoffman objectors") argue that the district court wrongly denied their motion to intervene. Finally, class counsel Korein Tillery appeals the district court's attorneys' fees award, contending that it was too low.

We conclude that subject matter jurisdiction exists, although based on diversity jurisdiction, not federal common law. On the merits, we vacate the district court's approval of the settlement agreement because the court did not adequately evaluate whether the settlement is fair to

class members. We do not reach the other issues raised by the objectors and class counsel.

**I**

Prior to this lawsuit, if a customer shipping a Letter Express package (an envelope intended to carry eight ounces or less at a special fixed rate) with Airborne failed either to indicate the actual weight of the package on the airbill or to write the number "1" in the weight section, she was charged a default rate equivalent to the cost of sending a five pound shipment. The actual cost of these shipments varied depending on the customer's particular arrangement with Airborne, but the record indicates that the default charge was typically about $5 higher than the regular Letter Express rate.

In April 2002, Synfuel filed a complaint against Airborne, asserting that the company's practice of charging a default rate constitutes a "penalty" and that "[f]ederal common law prohibits the imposition of a penalty, as opposed to liquidated damages, under any contract." Although Synfuel filed the initial suit only on its own behalf, an amended complaint added class allegations and sought to certify a class made up of "All Airborne Express, Inc. customers who have been assessed Letter Express charges based on a five pound default rate within the last ten years." Airborne moved to dismiss the suit, contending that application of a default rate was not a penalty but rather "an alternative contractual rate that determines how the sender will be charged for shipment." In support of this argument, Airborne attached a copy of one of its airbill forms, which states on its face: "If you fail to record the weight of the shipment on the airbill at the time of tender, we may, at our discretion, apply either a default rate or an additional service charge."

In October 2002, the district court denied Airborne's motion to dismiss, reasoning that "the default weight

provision resembles a penalty provision, rather than a liquidated damages provision or an alternative contract." The parties then entered into settlement discussions, eventually reaching an agreement in October 2003. The proposed settlement defines a settlement class of Airborne customers who were charged the default rate between April 11, 1992, and November 30, 2003. It allows each class member to submit a proof of claim form and supporting documentation and receive pre-paid Letter Express packages, worth approximately $13 each, according to the following schedule:

1-3 default charges = 1 package

4-7 default charges = 2 packages

8-12 default charges = 3 packages

12+ default charges = 4 packages

Alternatively, a class member may opt to receive a cash payment instead of the pre-paid packages:

1 default charge = $2.50

2 default charges = $5.00

3 default charges = $7.50

4-6 default charges = $2.00 per charge

>6 default charges = $1.50 per charge up to a maximum of $30.

A class member who submits a proof of claim form without providing supporting documentation is entitled to a single pre-paid Letter Express package.

In addition to compensating class members directly, the settlement requires Airborne to "implement new . . . training/enforcement measures intended to substantially increase the likelihood that packages are properly identified as Letter Express packages and that customers will include

the necessary information in airbills," and it requires Airborne drivers to fill in missing package weights on airbills. The agreement does not, however, altogether prohibit Airborne from charging the default rate. Finally, the settlement calls for Airborne to pay class counsel Korein Tillery $4.95 million in attorneys' fees and up to $45,000 in costs, and for class counsel to petition the court for an incentive award of $10,000 to be paid to Synfuel.

The district court conditionally certified the settlement class, approved a notice to be mailed to over 240,000 potential class members and printed in several national-circulation publications, and scheduled a fairness hearing for April 2004. By the date of the hearing, approximately 7,000 individuals (a paltry three percent) had filed proofs of claim and eight objections had been filed.

After hearing oral argument by the parties and objectors at the fairness hearing, the district court approved the settlement in a January 2005 order. The court rejected the complaint raised by the Hutsler objectors that the settlement provided insufficient compensation to class members, stating that it was "generous in light of the fact that Plaintiff's case is subject to a number of strong defenses." The district court also rejected the argument raised by objector Shapiro that the notice provided to class members was inadequate because several publications incorrectly stated that claims were due by June 23, 2004, as opposed to the deadline called for in the agreement of 60 days after final approval of the settlement. The Hutsler objectors and Shapiro filed timely appeals of the district court's approval of the settlement.

After a separate hearing, the court awarded class counsel Korein Tillery $600,250 in fees, significantly less than the settlement agreement contemplated. In response to this order, the Hoffman objectors, who had not previously appealed the district court's approval of the settlement

almost a year earlier, filed a motion to intervene to "preclud[e] reversion of the $4.4 million fee reduction to [Airborne]." The district court denied this motion because, among other reasons, it was untimely and class counsel had already filed a motion seeking "the exact same relief."

## II

### A

Although the issue of subject matter jurisdiction was not addressed below, it should have been; only after several supplemental filings have we finally been able to assure ourselves that the district court's jurisdiction was proper. Before the district court, class counsel maintained that jurisdiction was proper under 28 U.S.C. § 1331 because its claim arose under "federal common law." This is obviously wrong. Later, the possibility of diversity jurisdiction under 28 U.S.C. § 1332 emerged; we discuss that below.

The Supreme Court has stressed that, when it comes to jurisdiction, the "cases in which judicial creation of a special federal rule would be justified . . . are . . . few and restricted," *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (quoting *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87 (1994)), and are limited to those involving "uniquely federal interests.*"Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988). See also *Empire Healthchoice Assur., Inc. v. McVeigh,* 126 S.Ct. 2121, 2131-32 (2006) (noting that even where federal law controls, the prudent course is often to adopt state law as the federal rule of decision, rather than to create federal common law). Class counsel's argument for the applicability of federal common law in this case relies almost exclusively on decisions from other circuits holding that "federal common law applies to loss of or damage to goods by interstate common carriers by air.*" Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1195 (9th Cir. 1999); *Sam L. Majors Jewelers v. ABX, Inc.*, 117

F.3d 922, 929 (5th Cir. 1997) (holding that "a federal cause of action continues to survive for freight claims against air carriers").

These cases trace federal common law authority in this specialized area to Congress's 1887 enactment of the Carmack Amendment to the Interstate Commerce Act, a statute that "specified that federal law [ ] controlled liability for goods lost or damaged during interstate shipments." *Sam L. Majors Jewelers*, 117 F.3d at 926. While "the other major interstate commerce acts [eventually] included a provision that imposed liability on carriers for loss or injury to goods transported and provided for private civil actions to recover[,] [t]he Federal Aviation Act . . . failed to include such a provision." *Id.* at 927. To fill this gap, some federal courts have concluded that "civil actions against air carriers for lost or damaged goods arose under federal [common] law." *Id.* at 927-28. We need not decide whether we agree with this interstitial application of federal common law, however, because the cases cited are not relevant to plaintiffs' claim in this case. Synfuel and the other class members did not sue Airborne for lost or damaged goods. Their claim was about illegal billing practices. Nor does the class's argument find support in the Fourth Circuit's conclusion that late payment penalties charged by a common carrier are subject to federal common law rules about liquidated damages. See *Humboldt Express, Inc. v. The Wise Co.*, 190 F.3d 624, 637 (4th Cir. 1999). The *Humboldt* court derived its rule from federal statutory provisions and regulations governing such penalties. In contrast, class counsel has not pointed to any comparable sources of law from which a court might derive a federal common law rule governing Airborne's response to incomplete airbills.

Presumably aware of the jurisdictional flaw in the case, class counsel sought and received permission from this court to add diversity jurisdiction allegations to the complaint as permitted by 28 U.S.C. § 1653. In these allega-

tions, counsel stated that at the time Synfuel filed its complaint it was an Illinois limited liability company with its principal place of business in Illinois (it has since incorporated, hence its current designation as "Synfuel Technologies, Inc."). Airborne was, on the other hand, a Delaware corporation with its principal place of business in the State of Washington. We could not determine based on these pleadings whether the parties were completely diverse, however, because unfortunately the amended complaint failed to provide us with the citizenship of each of Synfuel's members. See *Wise v. Wachovia Securities, LLC*, 450 F.3d 265, 267 (7th Cir. 2006) ("The citizenship for diversity purposes of a limited liability company . . . is the citizenship of each of its members."). In a supplemental filing, class counsel now informs us that, at the time Synfuel originally filed this action, it was a *Minnesota* limited liability corporation with two members who were citizens of Illinois and Minnesota respectively. Based on this representation, we are finally in a position to conclude that the parties are completely diverse. (There is no excuse for the earlier ambiguity, we add; the rules concerning the plaintiff's duty to support subject matter jurisdiction in the federal court are too well established to require citation.)

The amended complaint also stated that 28 U.S.C. § 1332's amount in controversy requirement was met by the value of injunctive relief demanded, including "the cost of altering [ ] Airborne's method of doing business" to reduce the incidence of default charges, a cost plaintiffs estimate at approximately $30 million over four years. In determining the amount in controversy, "[t]he court cannot just add up the damages sought by each member of the class"; rather, "[a]t least one named plaintiff must satisfy the jurisdictional minimum." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 607 (7th Cir. 1997) (citing *Snyder v. Harris*, 394 U.S. 332 (1969), and *Zahn v. Int'l*

*Paper Co.*, 414 U.S. 291 (1973)). As the Supreme Court recently clarified, however, where "at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S.Ct. 2611, 2615 (2005). Furthermore, this court has been willing to look at the amount from either party's perspective; thus, "the cost to the defendant of complying with an injunction counts toward the jurisdictional minimum." *Rubel v. Pfizer Inc.*, 361 F.3d 1016, 1017 (7th Cir. 2004). The relevant test, however, "is the cost to each defendant of an injunction running in favor of one plaintiff; otherwise the nonaggregation rule would be violated." *Brand Name Prescription Drugs*, 123 F.3d at 610.

The key jurisdictional issue in this case, then, is whether Airborne could alter the default weight billing practice for an individual customer—in which case the value of the injunction to each individual class member is quantifiable and presumably quite small—or if it could comply with the proposed injunction only by undertaking a systemic change of its weighing and billing procedures, a change that would cost the same whether it was made for just one customer or every customer served by the company. When confronted with this question at oral argument, both Synfuel and Airborne agreed that the changes sought in the complaint could be instituted only on a systemic basis, because each package shipped by Airborne moves through an integrated delivery system. Based on this representation, we conclude that plaintiffs' complaint also meets the amount in controversy requirement and that we have diversity jurisdiction over this case.

Because the case was settled, we do not need to concern ourselves with the theory of substantive law on which plaintiffs were, or could have been, relying. Pleadings do

not need to spell out legal theories in any event, and we can imagine state-law claims for consumer fraud and deceptive practices that conceivably could apply here. (The implications of the change in applicable law for class certification are another matter, which is not before us at this time. The district court, however, is free to revisit this issue on remand. See FED. R. CIV. P. 23(c)(1)(C); *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1018 (7th Cir. 2002) (rejecting on the facts there presented a nationwide class action where "claims must be adjudicated under the law of so many jurisdictions," because "a single nationwide class is not manageable").) The important point at this stage of the proceedings is that the parties decided to settle the case rather than to test its legal sufficiency in court.

**B**

We turn now to the most substantial challenge raised by the objectors on the merits, which is the Hutsler objectors' claim that the district court erred in approving the settlement agreement as fair to class members.

A district court may approve a settlement only if it is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(1)(C). Although our review of a district court's approval of a class action settlement is limited to whether there was an abuse of discretion, *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996), we insist that district courts "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). In the past, we have gone so far as to characterize the court's role as akin "to the high duty of care that the law requires of fiduciaries." *Id.* at 280.

The Hutsler objectors complain particularly about the settlement's "capped regressive scale" of compensation, contending that the payment structure is disadvantageous to class members who were charged the default rate

by Airborne numerous times. They also argue that providing class members with pre-paid Letter Express packages is analogous to providing them with coupons, a method of compensation that has been widely criticized. See, *e.g.*, Christopher R. Leslie, "The Need To Study Coupon Settlements in Class Action Litigation," 18 GEO. J. LEGAL ETHICS 1395, 1396-97 (2005) (identifying three problems with coupon settlements: (1) it is doubtful that they "provide meaningful compensation to most class members"; (2) they often "fail to disgorge ill-gotten gains from the defendant"; and (3) they may force class members "to do future business with the defendant"); Geoffrey P. Miller & Lori S. Singer, "Nonpecuniary Class Action Settlements," 60 LAW & CONTEMP. PROBS. 97, 108 (1997) (noting that for many consumers "the right to receive a discount [or coupon] will be worthless").

In order to evaluate the fairness of a settlement, a district court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Isby*, 75 F.3d at 1199. The "most important factor relevant to the fairness of a class action settlement" is the first one listed: "the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979) (citing the MANUAL FOR COMPLEX LITIGATION § 1.46 at 56 (4th ed. 1977)). In conducting this analysis, the district court should begin by "quantify[ing] the net expected value of continued litigation to the class." *Reynolds*, 288 F.3d at 284-85. To do so, the court should "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range." *Id.* at 285. Although

we have recognized that "[a] high degree of precision cannot be expected in valuing a litigation," the court should nevertheless "insist[ ] that the parties present evidence that would enable [ ] possible outcomes to be estimated," so that the court can at least come up with a "ballpark valuation." *Id.* at 285.

In assessing the strength of the plaintiffs' case, the district court accepted class counsel's contention, largely unsupported by any evidence or analysis, that the regressive payment schedule and $30 cap appropriately reflected the impact of the statute of limitations and the voluntary payment doctrine on the class's claims against Airborne. This latter doctrine, "a corollary to the mistake of law doctrine[,] . . . holds that a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution." *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667 (7th Cir. 2001). The court reasoned that "[g]iven that a member is more likely to have 'full knowledge of the facts' after each successive default charge, counsel for the class and [Airborne] have appropriately incorporated a capped regressive scale to reflect the probability of a member's recovery."

While we do not dispute that the statute of limitations and the voluntary payment doctrine may have some relevance to certain class members' claims against Airborne, we cannot glean from the district court's opinion how it determined that this particular payment schedule and level of compensation is fair. In considering the fairness of the settlement, the court did not attempt to quantify the value of plaintiffs' case or even the overall value of the settlement offer to class members. Nor did it estimate how many class members' claims would be barred by the statute of limitations or the voluntary payment doctrine. In fact, the only effort to value the litigation that appears in the record is the Hutsler objectors' estimate that Airborne overcharged class members by $75 million during the

relevant period, a figure the district court dismissed as irrelevant to its evaluation of the fairness of the settlement.

Our confidence in the fairness of the settlement is further undermined by the agreement's bias toward compensating class members with pre-paid Letter Express envelopes instead of cash. Pre-paid envelopes, like coupons, are a form of in-kind compensation. "[C]ompensation in kind is worth less than cash of the same nominal value," since, as is typical with coupons, some percentage of the pre-paid envelopes claimed by class members will never be used and, as a result, will not constitute a cost to Airborne. *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001). Further, as the Hutsler objectors point out, although an individual pre-paid envelope is significantly more valuable to a class member than the equivalent amount of cash offered by the settlement, compensation in envelopes "require[s] the claimant to return to the Defendant to do business with him," something at least some class members likely would prefer not to do. And although this case is not covered by the Class Action Fairness Act (CAFA) of 2005, we note that in that statute Congress required heightened judicial scrutiny of coupon-based settlements based on its concern that in many cases "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value." Pub. L. 109-2, § 2(a)(3)(A), 119 Stat. 4, 4. We recognize that the pre-paid envelopes are not identical to coupons, since they represent an entire product, not just a discount on a proposed purchase. Nonetheless, they are a form of in-kind compensation that shares some characteristics of coupons, including forced future business with the defendant and, especially for heavier users, the likelihood that the full amount of Airborne's gains will not be disgorged.

Finally, we are not persuaded by Synfuel's contention that the operational changes required by the settlement "will result in over $30 million in savings that will flow

directly into the pockets of Class members." These changes will benefit only those class members who continue to purchase services from Airborne. The value of these operational changes must also be discounted to account for the fact that at least some, if not most, class members will not fail to record the weight of their packages in the future. It is future customers who are not plaintiffs in this suit who will reap most of the benefit from these changes. The class complaint specifically sought "[a] sum of money that represents the difference between the illegal penalties imposed on the Plaintiff and the Class and the amount that should have been imposed." The fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries.

Since we conclude that the district court abused its discretion by approving the settlement without adequately evaluating its fairness, we need not reach the other arguments raised by the objectors, nor the cross-appellants' appeal of the court's attorneys' fees award.

## III

We therefore VACATE the district court's approval of the settlement agreement and REMAND for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*