Selwyn **SILBERBLATT**, on behalf of himself and all others similarly situated, Plaintiff,

v.

**MORGAN STANLEY** and Morgan Stanley DW Inc., Defendants.

No. 05 Civ. 7569(PKC).

United States District Court, S.D. New York.

Nov. 19, 2007.

Ashley H. Kim, Joel Paul Laitman, Kurt Michael Hunciker, Schoengold Laitman & Lometti, P.C., Samuel P. Sporn, Schoengold & Sporn, P.C., Frank Rocco Schirripa, Schoengold Laitman & Lometti, P.C., New York City, for Plaintiff.

Richard A. Rosen, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

This is an application for final approval of a settlement of the claims of a certified class. In this context, plaintiff's counsel seeks an award of attorneys' fees on a percentage basis, valuing the recovery at $4,355,000, of which $2,855,000 is referred to as "Remedial Consideration." The Remedial Consideration is a potpourri, including revisions to sales brochures, alterations to third-party agreements and temporary modification of pricing policies to which class members and non-class members benefit equally. Plaintiff's valuation is flawed and grossly inflated. Even at that, only 500 of the approximately 23,000 class members, those who have open accounts, would be in a position to benefit from the Remedial Consideration. If plaintiff's request for fees and expenses were granted in full, counsel would receive 63% of the cash component of the settlement, an unfair result.

The Court concludes, after a hearing, that the cash component of the settlement, $1.5 million, is fair, reasonable and adequate to the members of the class and, on this basis, the settlement is approved. Plaintiff's counsel's fee award will be set at $300,000 or 20% of the cash component of the settlement, plus expenses of $150,016.44.[1]

The application of Selwyn Silberblatt, class representative, to be paid $9,600 in addition to the amount awarded to other members of the class is denied. A payment to him of $1,920 will be approved plus expenses of $840.

---

1. The award for expenses includes $44,318.52, which either was paid or will be paid by plaintiff's counsel to Garden City Group for the performance of administrative functions in connection with the settlement, including dissemination of the notice of proposed settlement to class members. Any additional amounts owed to Garden City Group will be paid from the Cash Settlement Fund, as set forth in the Stipulation and Agreement of Settlement.

## I. Prior Proceedings

This action was commenced on August 26, 2005. By Order dated October 18, 2006, this Court certified a class consisting of all persons who entered into contracts to purchase precious metals from and through Morgan Stanley DW Inc., the retail broker-dealer subsidiary of Morgan Stanley, during the period February 19, 1986 through August 26, 2005.

The parties engaged in extensive discovery and expert discovery closed on January 31, 2007. Thereafter, I set a schedule for defendants' proposed motion for summary judgment. Proceeding on a separate track, the parties engaged in private mediation. On April 20, the Court was informed that the parties had entered into a Memorandum of Under-standing, setting forth the terms of a proposed settlement.

I granted a motion for preliminary approval of the settlement and directed that notice be given to the members of the class. The proposed notice was clear and gave fair notice of the terms of the settlement and of the application for fees. I set September 14, 2007 as the date for individuals to opt out of the class and also as the date for class members to object to the settlement or to the request for attorneys' fees.

Notices were mailed to over 24,317 individuals. (Senzer Aff't, ¶ 4–6.) Notice was also published in the *Wall Street Journal.* (*Id.*, ¶ 7.) Opt outs were timely received from 27 individuals. (*Id.*, ¶ 10.) No class member objected to the settlement or fee application. (*Id.*, ¶ 10.) At the hearing on September 24, no objector appeared and no witnesses were called by the parties to the settlement. (Hearing Tr. 2–3.) Counsel orally argued their positions and responded to questioning from the Court.

## II. Fairness, Reasonableness and Adequacy of The Settlement from the Standpoint of the Class

### A. Standard for Reviewing the Fairness of the Settlement

Rule 23(e) (1)(A) provides that "[t]he court must approve any settlement . . . or compromise of the claims, issues, or defenses of a certified class." Rule 23(e)(1)(C) requires, as a precondition to approval of a settlement that would bind class members, that the Court find, after conducting a hearing, that the settlement "is fair, reasonable, and adequate." The parties have submitted to the Court a "Stipulation and Agreement of Settlement" (the "Settlement Agreement"), containing all of the terms of their agreement.

In conducting the review mandated by Rule 23(e), I have a duty "to make a considered and detailed assessment of the reasonableness of proposed settlements . . . ." *Weinberger v. Kendrick,* 698 F.2d 61, 82 (2d Cir.1982) (Friendly, J.). "The district court must consider many factors, including the complexity of the litigation, comparison of the proposed settlement with the likely result of litigation, experience of class counsel, scope of discovery preceding settlement, and the ability of the defendant to satisfy a greater judgment." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992) (citing *Weinberger,* 698 F.2d at 73–74 and *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)).

### B. Complexity and the Likely Results of Litigation

■ This is a diversity action for breach of contract, breach of fiduciary duty, fraud, unjust enrichment, negligent misrepresentation, and violations of N.Y. Gen. Bus. Law § 349–a and N.Y.U.C.C. § 2–313, arising out of the payment of storage fees associated with precious metals purchases.

Plaintiff alleges that he and other members of the class were misled into believing that specific bars or units of precious metals were allocated to them and, therefore, not subject to claims of creditors of defendants. He further alleges that defendants did not fully and truthfully disclose the true nature of defendants' purchase and storage practices and that plaintiff and members of the class paid excessive storage fees. Defendants assert that they did, indeed, purchase actual, physical metals for customers, albeit on an unallocated basis. They further assert that they made no misrepresentations regarding purchase or storage of precious metals and, in any event, no customer sustained any economic injury.

Although the claims were relatively straightforward in terms of the theories of liability, plaintiff would have had to overcome difficult obstacles in proving them. Plaintiff would have endeavored to prove that the nature of the contractual documents and surrounding representations left the impression that a quantity of precious metal would be segregated or allocated for the specific buyer. It is fair to observe that defendants' statements did not drive home the point that no specific metals were segregated for the particular purchaser. Yet, no single document indisputably excluded the possibility of unallocated holdings. For example, a silver purchaser was not given the number of a specific bar owned by him, which would have pointed toward an allocated purchase.

Among the hurdles for plaintiff was that no class member suffered a loss. Unallocated metals *could* have been subject to a lien by a creditor of defendants or the ware-houseman but none were. Also, it would have been difficult to establish that there was illegality in charging a storage fee for unallocated precious metals, absent a misstatement. Proving that a storage fee of .75% was excessive and unlawful would have been difficult in both legal theory and in fact.

## C. *The Proposed Settlement and Its Value*

■ As noted, the settlement consists of $1,500,000 in cash and $2,855,000 in so-called Remedial Consideration. Plaintiff's counsel asks that the Remedial Consideration be included in the overall valuation of the settlement. However, counsel seeks payment of all attorneys' fees and expenses out of the cash consideration. I will first address the cash component, next the allocation, and, finally, the Remedial Consideration.

### 1. *Cash*

In evaluating the adequacy of the cash component, I note that the storage fees were a very small portion of the overall precious metal transaction. Storage fees charged by defendants were 0.75% of the value of the customer's precious metal holdings. The aggregate amount of storage fees collected by defendants from class members over the class period was about $4 million. (Hearing Tr. 19.)

The full amount of all customer payments, $4 million, would have been at the high end of the range of any reasonably likely recovery, if liability had been established. A settlement of $1.5 million which amounts to 37.5% of all sums paid as storage fees during the class period is a very good settlement. This was not a good case for punitive damages because it would have been difficult to prove knowing misstatements or any extreme or outrageous behavior.

Standing alone and without the Remedial Consideration, the cash component renders the settlement fair, reasonable and adequate to the members of the class.

### 2. *Plan of Allocation: Pre–2000 versus Post–2000 Claimants*

■ Under the terms of the settlement, the cash portion of the settlement, which is $1.5 million less amounts paid to class counsel and the class representative, will be allocated such that 20% will be paid to the those incurring storage fees prior to January 1, 2000 and 80% to those incurring storage fees from January 1, 2000 to the end of the class period. The distinction was drawn in part because of the arguable bar of the statute of limitations for some pre–2000 claims.

I conclude that the distinction is warranted. New York, whose law would likely govern this diversity action, has a six-year limitations period for claims asserted in contract. N.Y. CPLR § 213(2). None of the claims in the Amended Complaint have a longer limitations period, with the possible exception of the fraud claim to which tolling might apply. N.Y. CPLR § 213(8). It would be difficult to establish *scienter* on the part of defendants, a requirement of a fraud claim.

Exactitude is not required in allocating consideration to the class, provided that the overall result is fair, reasonable and adequate. While there are some claimants who held precious metals from August 26, 1999 to December 31, 1999 whose claims would be timely under New York's six-year limitations period for claims asserted in contract, the limitations period is not the sole factor in assessing the reasonableness of the allocation. Older claims, even if not time-barred, would have been more difficult to prove. The plan of allocation meets the threshold of fairness.

### 3. *Remedial Consideration*

■ There are some 22,653 members of the class with accounts no longer open as of the last day of the class period, January 10, 2007. There were approximately 500 class members with accounts open on that date. (Hearing Tr. 18.) To those who had open accounts, the so-called Remedial Consideration was available.

No declaratory or injunctive relief was sought in the complaint. The claims of those with open accounts were not analytically stronger than those in the post–2000 period with closed accounts.

The Remedial Consideration consists of modifications to the customer disclosure statements explaining, among other things, the difference between "allocated" and "unallocated" ownership. Plaintiff's expert, Jeffery M. Christian of CPM Group, describes himself as "one of the world's foremost authorities on the precious metals markets . . . ." (Christian Aff't, ¶ 1). He breaks down the value of the revised disclosures into the following sub-categories: modification of customer disclosure, valued at $339,502.39; modification of Internal Broker Website, valued at $339,502.39 and modification of customer brochure, $339,502.39. A well-crafted letter on fancy, embossed stationary sent by overnight courier to each of the 500 holders could have conveyed the same information with much the same effectiveness at a fraction of the combined value exceeding $1 million. The methodology of valuation does not tie the disclosures to the approximately 500 holders to whom the new disclosures will be made. Class counsel conceded that the number of holders was not known as of the date of the expert's valuation. (Hearing Tr. 35–42.)

The Remedial Consideration also includes revisions to certain agreements between defendants or their affiliates and JP Morgan Chase and FideliTrade. The revisions afford better protections to customers. However, in each instance, the Settlement Agreement recites that "[d]efendants reserve the right to amend the

terms of the agreement at any time." Thus, the value of such a revision is inherently uncertain.

Defendants also have liquidated the precious metal holdings at a London storage facility and now use a Delaware facility.[2] Also, defendants agree that, during the next five years if any storage facility assigns its assets for the benefit of creditors or is in bankruptcy proceedings, then defendants will move the precious metals out of the warehouse or otherwise take steps to protect the customers.

Finally, there is (1) an adoption of quarterly billing, rather than a nonrefundable annual fee, so that an investor who holds for fewer than four quarters pays less in fees; and (2) a one-year storage fee cap reduction (from .75% per year to either .36% per year for unallocated precious metals or .60% per year for allocated precious metals). Class members and non-class members will benefit from these changes. The method of valuation utilized by the expert for these two items is exemplary of the flaws throughout the report. For the purposes of valuing the change to quarterly billing, the expert assumes that those who hold precious metals will keep them in unallocated metals and sell them off in equal installments over the four quarters of the following year; this is the low-end scenario to which he assigns a value of $144,288, including interest. For the high-end scenario, he assumes that all the metals will be stored on an allocated basis (with a higher fee) but will all be sold in the first quarter (a period the expert describes as the traditionally heavy selling period); this produces a figure of $543,203.82, including interest. He then averages the two figures to arrive at a value of $343,746.17. However, when valu-

ing the reduction in storage fees, the expert reverses fields and instead assumes no sales during any of the first three quarters and that all precious metals will be held at least into the fourth quarter. The inconsistent application of fundamental assumptions in a manner that inflates values to the benefit of plaintiff's counsel renders the expert's report unreliable.

The Remedial Consideration undoubtedly has some value but that value has not been proven. The methodology offered by the plaintiff's expert is so flawed as to be entitled to little weight. It assumes continued holdings for valuing one item but assumes the opposite in valuing another. It places a value on disclosures without knowing to how many investors the disclosures would be made. It was the plaintiff's privilege to offer credible evidence in support of valuation. Plaintiff was given the opportunity to call live witnesses but declined to do so. (Hearing Tr. 2–3.) The Court is incapable of fashioning an alternative valuation in the absence of a record that would enable it to do so in a reliable manner. No application to supplement the record was made at or since the hearing and do-overs are not an encouraged practice.

Of course, were the Court to assign some value to the Remedial Consideration, it would be unfair to saddle the 22,653 class members with closed accounts with a subsidization of the attorneys' fees attributable to Remedial Consideration that they will not receive. The creation of a subclass of those with open accounts on January 10, 2007 may have been appropriate, if the parties had provided a factual record adequate to do so. Unless fundamentally restructured, those in the subclass would receive a fraction of the cash, all of the

---

**2.** The physical location of the precious metals *is somewhat tangential to plaintiff's claim, although, if a lien issue were ever to arise, it* may be more burdensome for some class members to litigate a lien challenge in the U.K. rather than Delaware.

Remedial Consideration and any attorneys' fees attributable to the Remedial Consideration.

The Class Action Fairness Act of 2005 ("CAFA") governs the Court's consideration of proposed settlements in cases to which Rule 23 applies. 28 U.S.C. § 1711(2). It requires written findings as to any settlement in which class members receive coupons and permits the court to receive expert testimony on the "actual value" of the coupons. 28 U.S.C. § 1712(d) and (e). Further, it places restrictions on how attorney's fees are awarded in coupon settlements by, for example, requiring that the award be based on the value to the class of the coupons that are redeemed. 28 U.S.C. § 1712(a). The statute does not apply to all forms of non-monetary relief and, indeed, permits the use of "a lodestar with a multiplier method" in awarding fees where injunctive relief is obtained. 28 U.S.C. § 1712(b)(2) and (c).

The Seventh Circuit has had occasion to observe that a non-monetary benefit to class members—pre-paid express envelopes—had characteristics in common with coupons but were not coupons within the meaning of CAFA, principally because they represented the entire product and not just a discount on the price of the product. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir.2006).

Here, the reduction in storage fees may be viewed as a discount on a future purchase and, thus, has an important characteristic in common with a coupon. But unlike a coupon, the discount is not limited to class members. The discount is incapable of transfer because there would be no point to a transfer because the price re-duction has no relationship to class membership. Thus, it can have no value in a secondary market.[3] It fairly may be viewed as an across-the-board re-pricing of a component of the total price. Nothing is known of how this pricing component factors into the overall price to the customer. The parties have not presented me with any commitment to refrain from other charges or price increases so that the value of the reduction is quite uncertain.

The issue of whether a price reduction available to non-class members is a "coupon" under CAFA is an issue that has not been briefed by the parties, is likely to recur in future cases and need not be resolved in this case. That an item of non-monetary consideration may not fall within the statute's use of the term "coupon" does not make it any less worthy of close judicial scrutiny. Whether or not the storage fee reduction is a "coupon," its value has not been proven. I recognize that (with or without CAFA) I have the discretion to hear expert testimony on valuation and, indeed, could appoint an expert. Rule 706, Fed.R.Evid. The parties have been afforded the opportunity to present live witnesses but declined to do so and I see no good reason for the Court to appoint an expert under the circumstances described herein.

On this record, the value of the Remedial Consideration has not been proven.

### D. *Experience of Counsel*

Lead plaintiff's counsel has been admitted to practice in the State of New York for 50 years. He and his firm have had extensive class action experience. Defendants' counsel is a top national law firm with extensive experience defending com-

---

**3.** The Third Circuit considered the likely rate of utilization, the transfer feature and the value of the coupons in a secondary market as potential indicators of value. *In re General Motors Corp. Pick–Up Truck Fuel Tank Litig.*, 55 F.3d 768, 806–10 (3d Cir.1995).

plex and difficult lawsuits. Defendants had the resources to fight the claims through trial and on appeal.

### E. *The Negotiations*

The settlement was achieved as a result of arm's-length negotiations conducted under the supervision of an experienced private mediator, Michael D. Young.

### F. *Scope and Extent of Discovery*

Judging by one of the disputes that came before me, plaintiff's counsel were aggressive in the pursuit of discovery. The parties report that plaintiff conducted nine depositions in this case and that defendants produced thousands of pages of documents.

### G. *Ability of Defendants to Withstand a Judgment for a Greater Sum*

There is no serious question that the defendants could have withstood a judgment for an amount greater than that proposed to be paid in settlement.

### H. *Reaction of the Class*

No class member has objected to the settlement. This speaks in favor of its reasonableness but is not conclusive.

&ast; &ast; &ast; &ast; &ast; &ast;

Taking all of these factors into account, I conclude that a cash payment of $1,500,000 to the members of the class, allocated as indicated above, is fair, reasonable and adequate and it is approved.

### III. *Attorneys' Fees and Expenses*

■ Plaintiff's counsel seeks a fee award of $783,900. In support of the reasonableness of the figure, it reports a "lodestar" of $1,310,853. For the reasons more fully explained below, I conclude that an attorneys' fee award of 20% of the cash

consideration or $300,000 is fair and appropriate.

In reviewing a fee application in the class action context "the court is 'to act as a fiduciary who must serve as a guardian of the rights of absent class members'". *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 504 F.3d 229, 249–50 (2d Cir.2007) (quoting *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1099 (2d Cir.1977)). The award "must reflect 'the actual effort made by the attorney to benefit the class'." *Id.*

The Second Circuit has provided substantial guidance to the district courts on common fund fee applications in *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43 (2d Cir.2000). *Goldberger* made plain that the district court has discretion to use either the lodestar or percentage in setting a fee award.

> In sum, we hold that both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees in common fund cases. Of course, no matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee ....

*Id.* at 50.

*Goldberger* notes that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen." *Id.* It serves as "a 'cross-check' on the reasonableness of the requested percentage." *Id.* (quoting *General Motors,* 55 F.3d at 820). "Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court .... Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *Id.* (citations

omitted). The Second Circuit's recent opinion in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 117–18 (2d Cir.2007), moves away from the concept of a "lodestar" in favor of a "presumptively reasonable fee." "The reasonable hourly rate is the rate a paying client would be willing to pay." *Id.* at 117.

### A. The time and labor expended by counsel.

The first of the traditional factors in determining a reasonable common fund fee requires consideration of the time and labor expended by counsel. *Id.* Here, partner Samuel P. Sporn of Schoengold, Sporn, Laitman & Lometti, P.C., bills at the rate of $675 per hour. One other partner and an "of counsel" each bill at $550 per hour. Three associates of varying seniority and experience bill at $290, $350 and $425 per hour. While the record developed by plaintiff's counsel is skimpy, I nevertheless conclude—for the limited purpose of a crosscheck—that, taking account of the *Arbor Hill* factors, a paying client would be willing to pay these rates.[4] The 2,838.15 hours are not well-documented beyond a cursory summary. Nevertheless, I will use the $1,310,853.50, solely as a crosscheck on the reasonableness of the percentage of recovery award.

### B. The magnitude, complexities and risk of the litigation and quality of representation.

In discussing the fairness of the consideration to be paid in settlement, I have addressed the nature and magnitude of the claims, their complexity and the risk of success or failure and I will not do so again.

### C. The requested fee in relation to the settlement.

Plaintiff's counsel's proposed fee of $783,900 is 18% of plaintiff's full valuation of the settlement, including Remedial Consideration, of $4,355,000. When the $783,900 is added to the expenses of $150,016.44, the total requested fees and expenses, $943,916.44, would amount to 63% of the cash component. A fee award of $300,000, which I conclude is reasonable, represents 20% of the cash consideration. It is a negative multiplier of the "lodestar" of 4.4. Expenses in this case are $150,016.44 and I conclude they are reasonable under the circumstances. Total fees and expenses of $450,016.44 will be awarded, which amounts to 30% of the cash component.

### D. Public policy considerations.

While at least one other Circuit has viewed 25% of the recovery as a "benchmark," the *Goldberger* court noted that "we adhere to our prior practice that a fee award should be assessed based on scrutiny of the unique circumstances of each case, and 'a jealous regard to the rights of those who are interested in the fund.'" 209 F.3d at 53 (citation omitted). *Goldberger* affirmed a fee award that amounted to 4% of the total recovery. Percentages of 11%

---

4. In other areas of the law and based on better developed records, I have approved fees in the $400 to $555 range. *BMS Entertainment/Heat Music LLC v. Bridges*, No. 04 Civ. 2584, 2007 WL 1989292 at *2, *4 (S.D.N.Y. July 6, 2007) (partners in copyright suit: $400–555; associates: $225–440); *Martinez v. Port Authority of N.Y. and N.J.*, No. 01 Civ. 721, 2005 WL 2143333 at *26 (S.D.N.Y. Sept. 2, 2005) (lead trial counsel in civil rights case: $400); *In re AMF*, 334 F.Supp.2d 462, 467–68 (S.D.N.Y.2004) (securities class action: partners in range of $315 to $545 per hour). If I were to reduce Mr. Sporn's rate to .$550, it would reduce the overall fee calculation by a mere $36,625. The figure proposed by plaintiff's counsel is sufficient for crosscheck purposes.

to 19% have been awarded in cases with recoveries in the $50–75 million range. *See id.* at 52. Judges of this court have approved fees of 20% of the recovery net of expenses, *In re Independent Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676 at *7–*9 (S.D.N.Y. Sept. 29, 2003), and 20% of the cash and stock, *Varljen v. H.J. Meyers & Co., Inc.*, No. 97 Civ. 6742, 2000 WL 1683656 at *5 (S.D.N.Y. Nov.8, 2000). One court has approved a fee award of 8% of the total settlement amount. *Klein v. Salvi*, No. 02 Civ. 1862, 2004 WL 596109 at *11 (S.D.N.Y. March 30, 2004). I recognize that there are judges of this court who have awarded higher percentages in other circumstances.

## IV. Differential Payment to Class Representative

 The class representative seeks $9,600 as an "award" and $840 in reimbursement of out-of-pocket expenses in this case. Mr. Silberblatt undertook the selfless task of serving as a representative for the class, a fiduciary responsibility. Absent class members are entitled to repose confidence and trust in a class representative to pursue claims with diligence and refrain from proposing a settlement which is unreasonably low. This confidence derives in large measure from knowing that the class representative stands in the same shoes as all other members of the class. If the class does well, the class representative will do well in the same proportion to others.

Payments to class representatives, while not foreclosed, should be closely scrutinized. *See Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 720 (E.D.N.Y. 1989) (Nickerson, J.); *see also Brown v. Steinberg*, Nos. 84 Civ. 4654, 84 Civ. 4665 and 84 Civ. 8001, 1990 WL 161023 at *3–*4 (S.D.N.Y. Oct.13, 1990) (Motley, J.).[5] A differential payment may be appropriate in order to make the class representative whole. The representative plaintiff may have lost wages, vacation time or commissions from sales because of time spent at depositions or other proceedings. *See, e.g., Varljen v. H.J. Meyers & Co.*, No. 97 Civ. 6742, 2000 WL 1683656 at *5 n.2 (S.D.N.Y. Nov 8, 2000) ("lost wages" may be recovered). A class representative who has been exposed to a demonstrable risk of employer retaliation or whose future employability has been impaired may be worthy of receiving an additional payment, lest others be dissuaded. *See Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 200–05 (S.D.N.Y. 1997) (extensive findings on risk of retaliation) (Brieant, J.). A balance must be struck so that a class representative does not view his prospect for rewards as materially different from other members of the class, yet is not disadvantaged by his service in pursuing worthy claims.[6]

---

5. I note that at the outset of a suit brought under the Private Securities Litigation Reform Act ("PSLRA"), a lead plaintiff would be required to certify that he "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." 15 U.S.C. § 78u–4(a)(2)(A)(vi). The PSLRA also provides that "[t]he share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of the class shall be equal, on a per share basis" to the amount awarded to all other members of the class, but goes on to state that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party." 15 U.S.C. § 78u–4(a)(4). This case is not brought under the PSLRA and I give its provisions no weight in this case.

6. I am mindful that other respected judges have viewed a willingness to come forward to faithfully pursue a worthy claim with diligence and success as grounds for some level

Here, Mr. Silberblatt reports that he operates an herb farm in Maine and is endeavoring to launch "an entrepreneurial venture in the field of music education." (Silberblatt Aff't, ¶ 2) He spent time "staying informed and involved in the case during the settlement and Court hearing in this matter." (*Id.*, ¶ 4) Prior to the litigation, he pursued the issue with Morgan Stanley and read numerous articles on the subject. (*Id.*, ¶ 6–8) He reviewed drafts of the complaint and traveled to New York before the filing of the action and again for his deposition. (*Id.*, ¶ 10) He asserts that he has spent 240 hours on the matter and should be compensated at the rate of $40 per hour. (*Id.*, ¶ 16) Most of the work described is that which any person undertaking the task of class representative ought to expect and should not be compensated out of class funds. The two trips to New York, for which he spent a total of 48 working hours, stand in a different posture and presented a substantial inconvenience to him. *Cf. Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 571–72 (7th Cir.1992) (denial of incentive award affirmed where representative spent a few hours at a deposition and there was only a slight risk of exposure to costs or sanctions). Reimbursement of these hours at $40 per hour ($1,920), plus out-of-pocket expenses of $840, is reasonable. The total amount approved for payment to Mr. Silberblatt is $2,760. pocket expenses of $840, is reasonable. The total amount approved for payment to Mr. Silberblatt is $2,760.

*Conclusion*

The settlement is approved. Attorneys' fees of $300,000 and expenses of $150,016.44 are awarded to plaintiff's counsel. Selwyn Silberblatt may be paid $2,760 out of class funds.

SO ORDERED.

of award. *See, e.g., In re Polaroid*, No. 03 Civ. 8335, 2007 WL 2116398 at *3 (S.D.N.Y. July 19, 2007); *Sheppard v. Consolidated Edison*, No. 94–cv–0403, 2002 WL 2003206 at *5–*7 (E.D.N.Y. Aug.1, 2002); *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 124–25 (S.D.N.Y.2001); *Genden v. Merrill Lynch*, 700 F.Supp. 208, 210 (S.D.N.Y.1988). An empirical study of incentive awards reveals that they have been granted in 28% of 374 examined cases, including 59% of consumer credit class actions, 46% of employment discrimination class actions and 7% of mass tort actions. T. Eisenberg and G. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L.Rev. 1303, 1322 (2006).