Angel **ORTIZ, Ored Trujillo, Antonio Fuentes, and Isaac Barreto on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**CHOP'T CREATIVE SALAD COMPANY LLC, Colin McCabe, Tony Shure, and Nicholas Marsh, Defendants.**

No. 13–CV–2541 (KNF).

United States District Court, S.D. New York.

Signed Jan. 15, 2015.

Filed Jan. 16, 2015.

C.K. Lee, Lee Litigation Group, PLLC, Justin Mitchell Swartz, Molly Anne Brooks, Sally Jasmine Abrahamson, Outten & Golden, LLP, New York, NY; for Plaintiffs.

Carolyn Diane Richmond, Glenn Sklaire Grindlinger, Fox Rothschild, LLP, Eli Zev Freedberg, Law Office of Eli Freedberg P.C., New York, NY, for Defendants.

### MEMORANDUM AND ORDER

KEVIN NATHANIEL FOX, United States Magistrate Judge.

### BACKGROUND

Angel Ortiz ("Ortiz"), Ored Trujillo ("Trujillo"), Antonio Fuentes. ("Fuentes") and Isaac Barreto ("Barreto") are delivery workers who commenced this action against Chop't Creative Salad Company LLC ("Chop't"), Colin McCabe, Tony

Shure and Nicholas Marsh, pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201–219, and New York Labor Law ("NYLL"), Article 6, §§ 190–199a, and Article 19, §§ 650–665. The plaintiffs alleged that the defendants paid them "sub-minimum hourly wages, purporting to take a 'tip credit' under the FLSA or the NYLL," required the plaintiffs to do other than delivery work, such as food preparation, dishwashing, maintenance and cleaning, for "more than twenty percent of their time at work," failed to pay the plaintiffs "overtime pay, off the clock pay, call-in pay, and spread of hours pay," failed to provide proper wage statements and notices and deducted money, unlawfully, from the plaintiffs' wages, including the costs of purchasing and maintaining bicycles required to perform the plaintiffs' jobs. The parties agreed to mediate the dispute. Thereafter, the parties consented to jurisdiction by a magistrate judge, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.

On August 21, 2013, the parties participated in mediation, resulting in a settlement agreement, subject to the Court's approval. Without admitting liability, the defendants agreed to pay $800,000 to resolve all claims, including attorneys' fees not to exceed one-third of the gross settlement amount and costs approved by the Court, and all amounts to be paid to class members, service awards to the named plaintiffs approved by the Court, fees and costs associated with managing the settlement fund and the settlement claims administrator's fees.

On March 25, 2014, the Court approved, preliminarily, a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, the FLSA collective action and the parties' settlement agreement. The Court also approved the plaintiffs' proposed notice of the class action settlement agreement and appointed Outten & Golden LLP ("OG") and Lee Litigation Group, PLC ("LLG") as class counsel. On June 9, 2014, the plaintiffs made motions for the: (1) certification of the settlement class, final approval of the class action settlement and approval of the FLSA settlement; (2) approval of service awards; and (3) approval of the payment of attorneys' fees and reimbursement of expenses.

On July 17, 2014, the Court held a fairness hearing, during which no objections were made to the proposed settlement. At the end of the hearing, the Court announced its findings, approving finally: (1) the class action; (2) the class settlement agreement; (3) the FLSA collective action; and (4) the settlement of the collective action. Class members totaling 350 are eligible to receive payment under the settlement agreement. However, the Court expressed certain concerns related to the plaintiffs' motions for approval of the service awards and attorneys' fees and expenses, and directed the plaintiffs to make additional submissions, which they did, on August 14, 2014.

## SERVICE AWARDS

### Plaintiffs' Contentions

Initially, the plaintiffs sought approval of a service award of $5,000 for each named plaintiff, claiming that each "assumed significant risks," without identifying any risk. The plaintiffs also asserted that the named plaintiffs "contributed significant time and effort to the case by, among other things, providing Class Counsel with detailed factual information regarding [the defendants'] policies and other information relevant to their claims, and regularly making themselves available to communicate with Class Counsel when necessary, including through mediation." The named plaintiffs contended that they

"helped gather support for the case by informing other Class Members about the case and their right to participate in it," and "they were involved in lengthy settlement negotiations, including discussing and approving appropriate terms." The Court directed the named plaintiffs to supplement their request for service awards by providing details supporting their claims that they assumed significant risks and expended significant time and effort on this action. The plaintiffs submitted a supplemental memorandum of law and a supplemental declaration by their counsel, Justin M. Swartz ("Swartz"), in support of the motion for service awards. They contend the following:

Prior to sending a demand letter and drafting the complaint, counsel held two investigatory meetings with Ortiz, Trujillo and Fuentes. Barreto joined the case after these meetings. Barreto attended two meetings with counsel prior to the filing of the complaint. Each of the four meetings, during which these plaintiffs provided background information to counsel, lasted more than one hour. After the parties reached a memorandum of understanding at the mediation session, the named plaintiffs met with counsel for approximately 40 minutes to review the memorandum. They asked questions and assessed the document's fairness and adequacy. Subsequently, each named plaintiff met with counsel for approximately 30 minutes, reviewed and approved the settlement agreement. The named plaintiffs answered questions from class members and put counsel in touch with class members who had questions regarding the settlement. On March 20, 2014, an additional meeting was held with Ortiz, Trujillo and Fuentes, regarding the status of the case, lasting approximately 40 minutes. The named

plaintiffs approximate they spent the following time engaged in telephone conferences with counsel: (i) Ortiz, 3.5 hours; (ii) Trujillo, 1.9 hours; (iii) Fuentes, 0.8 hours; and (iv) Barreto, 2.2 hours. The named plaintiffs facilitated contacts between counsel and other current and former employees of the defendants. Each named plaintiff collected documents, including pay stubs, tip records and time entry receipts, which were provided to counsel. Prior to filing the complaint, each named plaintiff spent approximately 18 minutes reviewing and commenting on the complaint. The named plaintiffs contend that they encouraged former and current employees to provide additional information to counsel. According to the named plaintiffs, "[w]hen the Parties decided to pursue mediation, all of the Plaintiffs advised Class Counsel on which documents Class Counsel should request to assess damages." On August 21, 2013, during the 13–hour mediation session, the plaintiffs' counsel spoke on the telephone with Ortiz, Trujillo and Fuentes, individually, twice, for approximately six minutes each time, and with Barreto four times, for approximately six minutes each time.

The named plaintiffs assert that they "faced substantial risks and legitimate fears in stepping forward and becoming Named Plaintiffs." According to the named plaintiffs, they "are low-income, immigrant workers who are particularly vulnerable to retaliation," and "both Trujillo and Barreto were current employees when Plaintiffs filed the Complaint and, therefore, risked retaliation from Defendants." The named plaintiffs contend that, "[a]lthough Ortiz and Trujillo were no longer employed by Defendants when the Complaint was filed,[1] they nevertheless faced

---

**1.** The Court assumes that this is an error because the complaint alleged that Trujillo

and Barreto were employed by the defendants when the complaint was filed, while Ortiz and

[the] risk that future employers might discriminate against them."

### *Legal Standard*

 "New York law does not authorize incentive awards for named plaintiffs in class actions." *Flemming v. Barnwell Nursing Home & Health Facilities, Inc.,* 56 A.D.3d 162, 166, 865 N.Y.S.2d 706, 709 (App.Div.3rd Dept.2008).

> Incentive awards are not uncommon in class action cases and are within the discretion of the court. In calculating incentive fees, courts consider:

>> the existence of special circumstances including the personal risk (if any) incurred by the plaintiff applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery.

> The relevant inquiry is whether the particular case presents special circumstances justifying an incentive award. While the majority of reported decisions granting incentive awards arise out of securities litigation, such awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers. Although there is no specific measure for determining when an incentive award is justified, courts consistently focus on the existence of "special circumstances."

*Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 187 (W.D.N.Y.2005) (quoting *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 200–01 (S.D.N.Y.1997)) (internal citations omitted).

"A class representative is a fiduciary to the class. If class representatives expect routinely to receive special awards in addition to their share of recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 720 (E.D.N.Y.1989).

> Absent class members are entitled to repose confidence and trust in a class representative to pursue claims with diligence and refrain from proposing a settlement which is unreasonably low. This confidence derives in large measure from knowing that the class representative stands in the same shoes as all other members of the class. If the class does well, the class representative will do well in the same proportion to others. Payments to class representatives, while not foreclosed, should be closely scrutinized. A differential payment may be appropriate in order to make the class representative whole. The representative plaintiff may have lost wages, vacation time or commissions from sales because of time spent at depositions or other proceedings. A class representative who has been exposed to a demonstrable risk of employer retaliation or whose future employability has been impaired may be worthy of receiving an additional payment, lest others be dissuaded. A balance must be struck so that a class representative does not view his prospect for rewards as materially

---

Fuentes were former employees at that time. *See* Compl. ¶¶ 16, 26, 43 and 52. Thus, Ortiz and Fuentes were no longer employed by the defendants when the complaint was filed.

different from other members of the class, yet is not disadvantaged by his service in pursuing worthy claims.

*Silberblatt v. Morgan Stanley*, 524 F.Supp.2d 425, 435 (S.D.N.Y.2007) (internal citations omitted).

### Application of Legal Standard

#### The Named Plaintiffs' Time and Effort

■ Ortiz, Trujillo, Fuentes and Barreto filed the complaint in this action, on April 16, 2013. According to Swartz's declaration, prior to filing the complaint, these plaintiffs met twice with counsel, each meeting lasting "more than an hour." Swartz failed to indicate how much "more than an hour" each meeting lasted. The mediation session, during which the parties reached an agreement in principle on all material terms, memorialized thereafter in the settlement agreement, was conducted on August 21, 2013. Although the mediation session lasted approximately 13 hours, the plaintiff participated in the mediation session, via telephone, for the amount of time indicated here: (i) Ortiz, Trujillo and Fuentes spent approximately 12 minutes on two telephone calls with counsel, each lasting approximately six minutes; and (ii) Barreto spent approximately 24 minutes on four telephone calls with counsel, each lasting approximately six minutes. Subsequently, the named plaintiffs met with counsel three times, for approximately: (a) 40 minutes; (b) 30 minutes; and (c) 40 minutes. Moreover, the named plaintiffs spent approximately the following amount of time in telephone conferences with counsel: (1) Ortiz, 3.5 hours; (2) Trujillo, 1.9 hours; (3) Fuentes, 0.8 hours; and (4) Barreto, 2.2 hours. Each named plaintiff also spent 18 minutes reviewing and commenting on the complaint. Thus, according to the records, the following was identified as time expended by the named plaintiffs:

| | Meeting hours | Telephone hours | Complaint Review Hours | Total hours |
|---|---|---|---|---|
| Ortiz | 3.5 | 3.7 | 0.3 | 7.5 |
| Trujillo | 3.5 | 2.1 | 0.3 | 5.9 |
| Fuentes | 3.5 | 0.3 | 4.8 | |
| Barreto | 3.5 | 2.6 | 0.3 | 6.4 |

The named plaintiffs contend that they also performed other tasks in connection with this action, namely: (a) "answered questions from class members and put Class Counsel in touch with class members who had questions regarding the settlement"; (b) "facilitated contacts between Class Counsel and other current and former Chop't delivery workers"; (c) "collected documents, including paystubs, tip records, and time entry receipts—and provided them to Class Counsel"; (d) "ensured that the opt-in Plaintiffs possibly affected by Defendants' [potentially retaliatory] actions contacted Class Counsel" and "gathered information so that Class Counsel could evaluate the situation"; (e) "advised Class Counsel on [sic] which documents Class Counsel should request to assess damages"; (f) "encouraged former and current Chop't delivery workers to call Class Counsel to provided [sic] additional information"; and (g) "gathered information from their current and former co-workers about other people's experiences and provided that information to Class Counsel." However, the named plaintiffs failed to provide any specifics to enable the Court to assess their conclusory assertions concerning certain tasks they claim to have performed, such as gathering information or communicating with potential class members. For exam-

ple, the named plaintiffs assert they "answered questions from class members" without specifying how many class members contacted them with questions or how many questions were asked, what type of questions and with what frequency the questions were asked and over what period of time. The named plaintiffs did not explain how they "facilitated contacts between Class Counsel and other current and former Chop't delivery workers," how much of their time this task required, when and how often facilitating that contact occurred, or whether facilitating that contact prevented them from doing other activities. The named plaintiffs also failed to identify the number of documents they gathered, the approximate number, the amount of time required for gathering the documents or the level of difficulty involved in gathering the documents. The named plaintiffs did not identify what efforts they took to ensure "that the opt-in Plaintiffs possibly affected by Defendants' [potentially retaliatory] actions contacted Class Counsel," or how much of their time those efforts required and with what frequency they occurred over what period of time. Similarly, the named plaintiffs did not describe how they "encouraged former and current Chop't delivery workers to call Class Counsel to provided [sic] additional information," how many times they performed this task, with what frequency and over what period of time, how much time this activity took or whether their encouragements produced any results. It is not clear to the Court what qualified the named plaintiffs to advise "Class Counsel on which documents Class Counsel should request to assess damages," since assessing damages is a legal exercise, which the plaintiffs engaged counsel to perform.

Although the named plaintiffs did not identify when they started working with counsel prior to the filing of the complaint, it appears from the plaintiffs' submissions that, combining this unspecified time with the period of approximately four months between the filing of the complaint and the mediation, at which the parties reached the agreement, each named plaintiff spent less than 10 hours of his time on specific tasks related to this litigation. The named plaintiffs neither executed declarations nor sat for depositions, and no evidence exists that their involvement with the action required them to travel or incur out-of-pocket expenses. *See Silberblatt,* 524 F.Supp.2d at 436 (Staying informed and involved in the case during the settlement process, pursuing and researching related issues and reviewing drafts of the complaint are duties "which any person undertaking the task of class representative ought to expect and should not be compensated out of class funds."); *Fujiwara v. Sushi Yasuda Ltd.,* No. 12CV8742, 58 F.Supp.3d 424, 434, 2014 WL 5840700, at *6 (S.D.N.Y. Nov. 12, 2014) ("The time spent sitting for depositions merits a service award, and the risk may as well," but assisting counsel in drafting pleadings by providing information about the plaintiffs' job duties and the hours worked, as well as executing declarations, producing documents and communicating with other class members are "routine duties of class representatives," which are not the bases for service awards.). Upon close scrutiny, the Court finds that the named plaintiffs failed to show that they contributed significantly to the prosecution of this case.

*The Named Plaintiffs' Risks*

█ The named plaintiffs contend they are "low-income, immigrant workers who are particularly vulnerable to retaliation." However, they do not point to any case law to show that "low-income, immigrant" workers are more vulnerable to retaliation than other workers who are neither low income nor immigrants, or why the eco-

nomic status and nationality of the named plaintiffs are relevant to their taking a risk in bringing this action against their employers. The named plaintiffs assert, in a conclusory fashion, that: (a) "Trujillo and Barreto," who were the only plaintiffs employed by the defendants when the complaint was filed, "risked retaliation from Defendants"; and (b) "Ortiz and Trujillo," who were no longer employed by the defendants when the complaint was filed, "faced [the] risk that future employers might discriminate against them." Notwithstanding that the plaintiffs' memorandum of law contended erroneously that Trujillo was both employed and unemployed at the time the complaint was filed, their conclusory allegations and conjectures about future risks are not sufficient to show and convince the Court that the named plaintiffs took personal risks, or incurred, or may incur in the future, any disadvantage as a result of pursuing this action. No reason was presented by the named plaintiffs upon which the Court could rely to conclude that the defendants have taken or will take retaliatory action in the future against these plaintiffs. The named plaintiffs' assertions of a hypothetical fear of adverse consequences or lost opportunities are unsupported by evidence. Absent a demonstrable risk of employer retaliation or of an impairment to future employability, awarding additional payment to the named plaintiffs is not warranted.

The named plaintiffs contributed *de minimis* time and effort in pursuing this action, and they did not undertake any demonstrable risks warranting service awards. Upon close scrutiny, the Court

finds that no special circumstances exist warranting service awards. *See Silberblatt*, 524 F.Supp.2d 425, 436 (awarding a service award for 48 hours of work, at $40 per hour, the plaintiff spent traveling twice to New York from Maine, plus out-of-pocket reasonable expenses of $840, for a total of $2,760); *Frank*, 228 F.R.D. at 187–88 (awarding a service award to the only plaintiff where, as a result of a tolling agreement by the parties, the plaintiff's counsel's right to communicate with potential class members was restricted, and the plaintiff served as counsel's primary source of information, was often called to review documents and respond to his counsel's questions and "submitted an affidavit attesting to his fears that his role in this case could deleteriously affect his future employment opportunities.").

## ATTORNEY'S FEES AND COSTS

### *Plaintiffs' Contentions*

The plaintiffs contend that class counsel are entitled to a reasonable fee of "33.3% of the Settlement Fund ($266,666.00),"[2] and reimbursement of $5,516.14 for out-of-pocket expenses, to which no class member objected. The plaintiffs contend that counsel: (a) "conducted in-depth interviews with the named Plaintiffs and other class members to determine hours worked, wages paid, the nature of their duties, and other relevant information"; (b) analyzed "thousands of pages of documents in response to Plaintiffs' requests for pre-mediation discovery," including "records of dates of employment, time punch entries, payroll and tip allocation records, wage statements, and financial records of Plain-

---

**2.** The Court notes that "33.3%" of $800,000 is $266,400.00, not $266,666.00. The plaintiffs seek attorneys' fees in the precise percentage form of "33.3%," not in the fraction form of one-third, which is an approximate percentage, or "33 1/3 of the common fund," as the

plaintiffs recite in their memorandum of law. A difference exists between the specific percentage requested in the notice of motion and the approximate percentage representing one-third of the settlement amount, which was not requested in the notice of motion.

tiffs and Class Members"; (c) "conducted legal research on the underlying merits of Plaintiffs' and Class Members' claims and the damages to which they were entitled"; (d) "held a pre-mediation call with the mediator, submitted a detailed mediation statement outlining Defendants' vulnerabilities and acknowledging risk, and compiled an Excel spreadsheet detailing damage calculations for all Class Members"; and (e) "attended an approximately 13–hour mediation," where the parties "reached an agreement in principle on all material terms, which they memorialized in the Settlement Agreement." Moreover, the plaintiffs assert, "the requested fee is not based solely on time and effort already expended, rather, it is also meant to compensate Class Counsel for time that will be spent administering the settlement in the future." They maintain that, "[b]ased on Class Counsel's experience, administering this class settlement will likely require an ongoing commitment," including responding to "Class Member inquires after final approval, especially after checks are issued."

The plaintiffs contend that this action involved mixed questions of fact and law, in particular, "the parties disputed the facts surrounding the job duties of the delivery workers whom Plaintiffs alleged were improperly paid the tipped minimum wage under the FLSA and state law." According to the plaintiffs, "Class Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case on a wholly contingent basis in the face of significant risk." Moreover, this case "presented hurdles to a successful recovery," such as overcoming the defense that the defendants "were entitled to take a tip credit because Plaintiffs and Class Members did not spend more than 20 percent or two hours of their workday engaged in non-tip producing 'side work.'" Counsel also

faced the risk that the Court would not grant conditional certification of the class action and collective action, "and such determination would likely be reached only after extensive briefing."

The plaintiffs contend that "Class Counsel have substantial experience prosecuting large-scale wage and hour class and collective actions," and the "size of the $800,000.00 settlement weighs in favor of granting the requested fee award of "33 1/3% of the common fund," because courts in this circuit grant requests routinely for payment of one-third of the fund in cases with settlement funds similar to or larger than the one here. According to the plaintiffs, public policy considerations weigh in favor of granting their attorneys' fees request, since FLSA and NYLL "are remedial statutes designed to protect the wages of workers," and "fee awards in cases like this serve the dual purpose of encouraging 'private attorneys general' to seek redress for violations and discouraging future misconduct of a similar nature."

The plaintiffs assert that "the lodestar cross check method" further supports an award of "33 1/3 percent of the settlement fund," because the request "is approximately 1.1 times 'lodestar,'" and "[t]his minimal multiplier is well within the range of multipliers that courts have allowed." According to the plaintiffs, "Class Counsel spent approximately 718.70 hours litigating and settling this matter," and the "hours worked by Class Counsel result in a lodestar of approximately $246,250.50." Moreover, the plaintiffs are entitled to reimbursement of out-of-pocket expenses under the settlement agreement, and $5,516.14, including "court fees, postage and courier fees, transportation, photocopies, electronic research, document management fees, messenger and process server fees, and Plaintiffs' share of the mediator's fees," is

an amount "incidental and necessary to the representation of the Class."

Swartz submitted his declaration with exhibits, in support of the plaintiffs' request for attorneys' fees. He stated that OG has "significant experience prosecuting wage and hour class and collective actions such as this one," and class counsel "spent approximately 718.70 attorney, paralegal, and support staff hours litigating and settling this litigation." Swartz stated that he, "along with a team of attorneys and paralegals at O & G and our co-counsel, the Lee Litigation Group, conducted a thorough investigation into the merits of the potential claims and defenses" and "conducted in-depth interviews with numerous Plaintiffs to determine the hours they worked, the wages they were paid, the nature of their duties and responsibilities and other information relevant to their claims." Swartz asserts he also obtained and reviewed numerous documents from the plaintiffs and conducted background research on the defendants, including reviewing corporate filings and press interviews. According to Swartz, on or about June 18, 2013, the parties agreed to mediate the case and, over the next several months, engaged in mediation discovery to allow the parties to assess the claims and calculate damages prior to mediation. Counsel analyzed data produced by the defendants and "constructed a damage model based on the data," as well as met with the defendants to confer about the data available for damages calculations. Counsel attended an approximately 13–hour mediation session, which resulted in the settlement agreement. Attached to Swartz's declaration are: (1) Exhibit A, "summaries of the time spent by each attorney, paralegal, and support staff member as of June 9, 2014, and the costs incurred"; (2) Exhibit B, "O & G's contemporaneous time records"; (3) Exhibit C, "Summary of O & G's itemized costs"; (4) Exhibit D, "Joint Stipulation of Settlement and Release;" (5) Exhibit E, "Notice of Proposed Settlement of Collective and Class Action Lawsuit and Fairness Hearing" that was sent to class members; and (6) Exhibit F, "the Declaration of Mark Patton, dated June 5, 2014, who supervised the administration of the settlement notices in this case."

C.K. Lee ("Lee") submitted his declaration with Exhibit A in support of the plaintiffs' request for attorneys' fees. He stated that he received a law degree from the University of Pennsylvania Law School in 1997 and was admitted to the New York bar in 1998. Prior to forming LLG, Lee was a partner in Kraselnik & Lee and he "was associated with some of the top firms in New York City." According to Lee, he has been a co-lead counsel on several wage and hour cases that district courts have certified as class actions and collective actions. Lee stated that attorneys in his firm spent approximately "229 attorney, paralegal, and support staff hours litigating and settling this action." Lee contends that Exhibit A attached to his declaration, contains "LLG's contemporaneous time records," and that "LLG has accrued no expenses." According to Lee, his firm "ordinarily and regularly bills clients on an hourly fee basis, based upon each attorney's standard hourly rate," and "[c]urrently, LLG's rates range from $550 per partner's hour, $350 per counsel's hour, $175–250 per associate's hour, and $125 per paralegal's hour." Lee stated that "[t]o date, Class Counsel has worked without compensation of any kind, and the fee has been wholly contingent upon the result achieved." Lee's statements in paragraph Nos. 16 to the end [3] of the declaration are

---

**3.** Lee's declaration contains erroneous para-

graph numbering, whereby following para-

identical to the statements in Swartz's declaration.

### Plaintiffs' Supplemental Contentions

The plaintiffs submitted a supplemental declaration by Swartz, in which he provided information on the background and experience of OG's counsel and support staff. Swartz stated that he graduated with honors from DePaul University School of Law in 1998 and his practice has been focused almost exclusively on employment law, representing employees. Prior to joining OG in 2003, Swartz represented workers as an associate at Goodman & Suchlewski, LLP in New York and Stowell & Friedman, Ltd., in Chicago.

Swartz reports that Rachel Bien ("Bien") is a partner and Brooklyn Law School cum laude graduate. Prior to joining OG in 2005, she was a law clerk in the United States Court of Appeals for the Ninth Circuit. Molly Brooks ("Brooks") is of counsel to OG and graduated from Northeastern University School of Law in 2004. Prior to joining OG in 2008, she practiced labor and employee benefits law at Cohen, Weiss and Simon LLP.

Juno Turner ("Turner") is an OG associate, who graduated magna cum laude from Fordham Law School in 2006. Turner spent two years investigating and prosecuting wage and hour violations at the office of the New York State Attorney General, prior to accepting a clerkship in the United States District Court for the Eastern District of New York. Delyanne Barros ("Barros"), who graduated cum laude from Pace University School of Law in 2008, was an OG associate from 2008 to April 2014. She represented employees in employment law litigation and negotiations, including wage and hour cases, indi-

vidual sexual harassment and discrimination cases, and severance and offer letter negotiations. Amber Trzinski ("Trzinski"), who graduated in 2009 from the University of Denver Law School, has been an OG associate since 2011. Prior to joining OG, she was a law clerk in the United States District Court for the Southern District of New York and held a one-year position with Legal Aid of Western Missouri. Michael Scimone ("Scimone") is an OG associate, who graduated in 2009 from the City University of New York School of Law. He worked for the National Labor Relations Board, Region 2, the legal department at UNITE HERE, Make the Road by Walking, and the Legal Aid Society's Employment Law Project. Sally Abrahamson ("Abrahamson") has been an OG associate since 2012, and graduated cum laude from the American University, Washington College of Law. Abrahamson litigated wage and hour cases at the D.C. Employment Justice Center from July 2011 to September 2012, and served as a judicial clerk for two years in the United States District Court for the Western District of Texas. Deirdre Aaron ("Aaron") is an OG associate, who graduated magna cum laude in 2010 from Washington University in St. Louis School of Law. Prior to joining OG in 2012, she worked as a staff attorney at the United States Court of Appeals for the Eighth Circuit. Christopher McNerney ("McNerney") is an associate who graduated cum laude in 2012 from New York University School of Law. Prior to joining OG in 2013, he was a law clerk in the United States District Court for the Southern District of New York. Hunter Swain ("Swain") joined OG in 2013. He graduat-

---

graph No. 36, it reverts back in numbering to Nos. 34 through the last paragraph, No. 36. Swartz's declaration also contains the numbering error following paragraph No. 36,

whereby it repeats the numbering of the subsequent paragraph as No. 36 and continues numbering until the last paragraph, No. 43.

ed cum laude from the University of Colorado Law School.

Swartz also provided information on the background and experience of the following paralegal staff: Michelle Leung, Rosemary Almonte, Jessica R. Lyons, Kristine DeLeon, Kenneth Leung, Krystle Noweski, Leanna Lorenzana, Molly Hendricksen, Alexis Werth and Frank Delvecchio, as well as Georgia Willett, a technical administrator.

According to Swartz:

Although twelve O & G attorneys performed at least some work on this case, a core team of three attorneys and three paralegals were responsible for 95 percent of the attorney-billed time, and 65 percent of the support staff-billed time, respectively. Attorneys and paralegals not in this core group performed discrete tasks that required little or no ramp-up time, such as cite checking and inputting damages data into spreadsheets.... Almost two-thirds of the attorney time billed by O & G was recorded by Sally Abrahamson, who performed much of the initial drafting of the Class Action Complaint ("Complaint"), mediation statement, and briefs.

Swartz contends:

O & G and Lee Litigation Group drafted different portions of Plaintiffs' Complaint, in order to avoid duplicative work.... Ms. Abrahamson reviewed previous wage and hour complaints against similar employers and revised and updated certain legal sections of those complaints, to be used as part of the Complaint, on November 16, 2012.... O & G and Lee Litigation Group were initially retained by different Named Plaintiffs and drafted the portions of the Complaint that related to their respective clients.... O & G carefully monitors and controls the quality of everything that is submitted to the Court. For this reason, a partner always reviews and edits the drafts produced by associates.... In addition, as part of O & G's quality control measures, a partner reviews all documents after they have been filed on ECF. I therefore reviewed the filed Complaint "as filed" and corresponded with Ms. Abrahamson about it on April 16, 2013.... In an effort to submit polished documents to the court, O & G's practice is to have attorneys who did not draft the briefs edit and cite check of [sic] the briefs prior to submitting them to the Court.

Swartz contends that Abrahamson translated the retainer agreement used in this action from English to Spanish. She billed 0.8 of an hour at an hourly rate of $360, for a total of $228, for the translation. After Abrahamson completed the translation, a paralegal fluent in Spanish reviewed the retainer to ensure that the translation was accurate. Swartz explains that his January 16, 2014 entry for "Review Applebee's Order" refers to an order in another case involving issues almost identical to those at issue here. Swartz asserts:

Assigning tasks such as saving documents and maintaining case files to paralegals, and not attorneys, enables O & G to ensure that the case is litigated as efficiently as possible.... On February 6, 2014, Jessica Lyons, an O & G paralegal, saved signature pages of the Settlement Agreement to the case file. To do so, Ms. Lyons communicated with co-counsel and Named Plaintiffs to obtain the signature pages for the settlement agreement and saved them to O & G's computer system.... On February 19, 2014, Ms. Lyons expended one-tenth of an hour to save Class Counsel's draft preliminary approval papers to the case file.... Ms. Lyons also spent one-tenth of an hour calendaring court deadlines

on March 28, 2014. On May 19, 2014, Leana Lorenzana, an O & G paralegal, expended two-tenths of an hour updating O & G's call log. This update included centering attorney notes about calls with the Plaintiffs and opt-in Plaintiffs, and updating contact information. Ms. Lyons and Ms. Lorenzana both reported that they used the timer in O & G's billing software and, for each of these tasks, accurately recorded, to the tenth of an hour, the amount of time they spent on the task.

Lee also submitted a supplemental declaration, in which he stated that he is the principal of LLG, which is a seven attorney firm focused on representing plaintiffs in employment matters. Lee reports that Anne Selig ("Selig"), a 2003 graduate of New York Law School admitted to the New York bar in 2004, is counsel to LLG, and she has more than ten years of litigation experience, specializing in employment law. Shin Hahn ("Hahn") was a third-year associate specializing in employment law. She graduated from Northwestern University Law School and was admitted to the New York bar in 2012. Clela Errington ("Errington") was a first year associate who graduated from New York University School of Law and was admitted to the New York bar in 2013. Xiao Ma is a first year associate who graduated law school in China in 2009 and received his Master of Laws degree from Seton Hall University School of Law in 2013. Jasmin Perez has been a paralegal since 2012 and Luis Arnaud has been a paralegal since 2013.

Lee contends that "a team of five LLG attorneys, and two LLG paralegals worked on this case," and he was responsible for the majority of attorney-billed time, "approximately 34%." According to Lee, Hahn, the primary associate assigned to this case, billed "approximately 21% of the attorney-billed time," and she took the lead in drafting certain legal and factual portions of the Complaint. Lee contends that Errington and Hahn left their employment with LLG "during the litigation" which explains "the number of associates that had billed time on this case." Attached to Lee's supplemental declaration is Exhibit A, a retainer agreement, dated September 13, 2013, between LLG and Emin Cekic, in an unrelated action, in support of Lee's contention that his "firm's clients regularly accept and pay LLG's hourly rates."

In their supplemental memorandum of law in support of the attorneys' fees request, the plaintiffs contend:

> Although not a highly complex matter, Plaintiffs respectfully disagree that this case was 'simple and straightforward,' as far as wage and hour cases go.... Among the factors that complicated this matter are the size and condition of the data production, the relatively novel legal issues raised, investigating the amount of time Defendants required delivery workers to engage in non-tipped duties, and the difficulty of gathering evidence from non-English-speaking low-wage workers.

According to the plaintiffs:

> Although Class Counsel has significant experience in wage and hour class action litigation, ... this case included relatively novel and fact-intensive claims.... Specifically, Plaintiffs alleged that Defendants failed to provide delivery workers a wage notice at the time of hire and annually thereafter, as required by NYLL § 195(1)(a), and that Defendants failed to provide employees with proper wage statements accompanying every payment of wages in violation of NYLL § 195(3). The statutory requirements were only codified into law on April 9, 2011 and have not been widely litigated.

Therefore, Class Counsel was required to interpret and evaluate the causes of action in order to determine how to plead and prove them.... Class Counsel conducted extensive interviews with more than a dozen potential class members to establish Defendants' policy with respect to tipped workers and determine whether it was a company-wide policy applicable to the entire class, and not a practice isolated to a single restaurant.... In addition, damage calculations in this case were particularly time-intensive.... Defendants provided Plaintiffs with each delivery worker's daily hours, and daily tips. This process was work-intensive because Defendants produced this information in thousands of pages of data that Class Counsel had to collate and convert to a usable form before performing calculations for each individual worker.

The plaintiffs maintain that the number of attorneys who worked on this case was justified, and "Class Counsel intentionally staffed this case in a way that would ensure that tasks would be performed by the lowest-billing individual who could perform the work effectively"; thus, "the Court should not reduce Plaintiffs' requested fees based on the number of attorneys who worked on the file because there is little or no evidence of 'clear and unnecessary duplicative efforts.' "

The plaintiffs contend that the time billed by the technical administrator was recorded appropriately because it took her two hours to capture an online video interview containing relevant information from the Internet and save it to Class Counsel's server. That time was needed "because she had to experiment with several different programs to ensure that she could save a high-quality video file." With respect to time drafting, reviewing and filing the complaint, the plaintiffs contend that LLG "drafted different portions of the Com-

plaint," and "Abrahamson reviewed previous wage and hour complaints against similar employers and revised and updated certain legal sections of those complaints, to be used as part of the Complaint, on November 6, 2012." The plaintiffs contend that "Class Counsel bills to the tenth of the hour, a common billing practice routinely endorsed by courts," and "[o]ne-tenth of an hour billing is a small enough increment that it does not overbill for small tasks. This is true because almost any task requires a minute or two of preparation time, requires a minute or two of checking to ensure accuracy, and causes disruption of other work that extends beyond the time it takes to actually execute the task." The plaintiffs assert that the time counsel and paralegals spent on this action is reasonable. They contend that references to "Stores" in their time entries refer to the defendants' restaurants because "[r]eferring to a location of a chain restaurant as a 'store' is common parlance in the restaurant industry." The plaintiffs contend that, even if the entries with which the Court expressed concern at the fairness hearing, are removed from their request for attorney's fees, their request for one-third of the settlement fund is still less than counsel's lodestar for the work done in this case.

### *Legal Standard*

#### *Awarding Attorney's Fees and Costs*

■ Although FLSA is a fee-shifting statute, providing that the court must "in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action," 29 U.S.C. § 216(b), no judgment is awarded to the plaintiffs where, as here, the plaintiffs entered into the settlement agreement with the defendants. However, the Supreme Court

has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The common-fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (internal citations omitted).

At the end of the fairness hearing, the Court certified the class and approved the collective action and the settlement agreement between the plaintiffs and the defendants. Under the common-fund doctrine, the plaintiffs are entitled to recover reasonable attorneys' fees and the costs incurred in this action.

*Calculating Reasonable Attorneys' Fees and Costs*

 [T]he determination of fees "should not result in a second major litigation." The fee applicant must ... submit appropriate documentation to meet "the burden of establishing entitlement to an award." But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

*Fox v. Vice*, 563 U.S. 826, 131 S.Ct. 2205, 2216 [180 L.Ed.2d 45] (2011) (internal citations omitted).

 Although the Second Circuit indicated its preference is to abandon the term "lodestar," and it "acknowledged that 'the trend in this Circuit is toward the percentage method,' it remains the law in this Circuit that courts 'may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund method.'" *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir.2010) (quoting *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir.2005)). Under the lodestar method,[4] "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir.2000). After the computation is done, "the district

---

4. The Second Circuit explained:

While it is true some district courts in this Circuit have expressed uncertainty as to the relevance of [*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir.2008)] in common fund cases, this Court's case law does not suggest that there are two different lodestar methods.... From a mathematical perspective, of course, it makes little difference whether a court, following *Arbor Hill*, considers case-specific factors to estimate a reasonable rate for an attorney's services, which is then multiplied by the number of hours worked, or whether the court takes the traditional approach and considers these same factors in calculating a multiplier to the lodestar.... [T]he specific factors considered by courts in common fund and statutory fee-shifting contexts are somewhat different....

*McDaniel*, 595 F.3d at 421–22 (internal citations omitted).

"We do not suggest that concerns present in the common fund and statutory fee-shifting contexts are identical in every respect, ... but simply that the lodestar approach is common to both." *Id.* at 422 n. 7.

court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* Under the percentage method, "[t]he court sets some percentage of the recovery as a fee." "In determining the percentage of award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Id.*

 "[W]hether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances," and that determination is left "to the sound discretion of the district court." *Id.* When exercising its discretion, "the district court fulfills both its 'duty to act as a fiduciary who must serve as a guardian of the rights of absent class members and ... the requirement of a searching assessment regarding attorneys' fees that should properly be performed in each case.'" *In re Bank of America Corp. ERISA Litig.,* 772 F.3d 125, 134 (2d Cir.2014) (quoting *McDaniel,* 595 F.3d at 419). "[A] fee award should be assessed based on scrutiny of the unique circumstances of each case, and 'a jealous regard to the rights of those who are interested in the fund.'" *Goldberger,* 209 F.3d at 53 (citation omitted).

 In determining whether the requested fees are reasonable, courts use various factors, including: (a) "the time and labor expended by counsel; (b) "the magnitude and complexities of the litigation"; (c) the risk of the litigation"; (d) "the quality of representation"; (e) "the requested fee in relation to the settlement"; and (f) "public policy considerations." *Id.* at 50 (citation omitted). "Although attorney experience is not explicitly enumerated among the *Goldberger* factors, it is clear that experience might

be relevant to several of them, including consideration of the time and effort expended by counsel, the complexity of the litigation and quality of the representation." *McDaniel,* 595 F.3d at 423. Courts must "approach fee awards 'with an eye to moderation,'" and the contingency risk and quality of representation factors "do not always compel enhanced fees." *Goldberger,* 209 F.3d at 53 (citation omitted). The Second Circuit has "historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." *Id.* at 54 (citation omitted). "It is well-established that litigation risk must be measured as of when the case is filed." *Id.* at 55. "[T]he quality of representation is best measured by results, and ... such results may be calculated by comparing 'the extent of possible recovery with the amount of actual verdict or settlement.'" *Id.* (citation omitted). "[A] big recovery does not necessarily justify a quality multiplier," and "a large settlement can as much reflect the number of potential class members or the scope of the defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel." *Id.* at 56 (citation omitted). Attorney fee awards include reasonable out-of-pocket expenses, such as those for photocopying, travel, telephone costs, postage and computerized research. *See LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 763 (2d Cir.1998).

### Application of Legal Standard

#### Counsel's Time and Labor

 The plaintiffs disagreed with the Court's characterization of this action as simple and straightforward, contending the action was complicated because of "the size and condition of the data production, the relatively novel legal issues raised, investi-

gating the amount of time Defendants required delivery workers to engage in non-tipped duties, and the difficulty of gathering evidence from non-English speaking low-wage workers." The Court will address each of the plaintiffs' contentions.

With respect to "the size and condition of the data production," the only contention the plaintiffs make is that the defendants produced "thousands of pages of data that Class Counsel had to collate and convert to a usable form before performing calculations for each individual worker." However, the plaintiffs do not specify how many "thousands of pages" the defendants produced to them or how much time it took the plaintiffs' counsel "to collate and convert to a usable form" those "thousands of pages." A review of the billing records submitted by the plaintiffs' counsel does not indicate any entry for collating and converting "thousands of pages" of the documents claimed to have been produced by the defendants.

The plaintiffs further contend that this action was complicated because of "the relatively novel legal issues raised." The plaintiffs point to their allegations that the defendants failed to provide wage and hour notices and statements, as required by NYLL § 1951(1)(a) and in violation of NYLL § 1951(3), as "the relatively novel and fact-intensive claims," which, although "codified into the law on April 9, 2011, have not been widely litigated," and required counsel "to interpret and evaluate the causes of action in order to determine how to plead and prove them." The plaintiffs alleged violations of NYLL §§ 195(1)(a) and 195(3) in the complaint. *See* Compl. ¶¶ 147, 148, 183–186.

Every employer shall provide her employees: (a) a notice explaining the rates of pay, as well as the basis thereof and allowances claimed as part of the minimum wage, including tips and meals, *see* NYLL § 195(1)(a); and (b) a statement with every payment of wages listing, *inter* alia, the dates of work covered by that payment of wages, rate of pay, deductions, allowances claimed as part of the minimum wage and any commission, *see* NYLL § 195(3). If an employee is not provided with a notice explaining the rates of pay, working hours and other provisions of the law concerning her employment, including tips and meals, that employee is entitled to recover, through a civil action, "fifty dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of two thousand five hundred dollars, together with costs and reasonable attorney's fees." NYLL § 198(1)(1–b). If an employee is not provided a statement, as required by NYLL § 195(3), she is entitled to recover, through a civil action, "damages of one hundred dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of twenty-five hundred dollars, together with costs and reasonable attorney's fees." NYLL § 198(1)(1–d).

The plaintiffs' contention that this case is complicated, because it involves "novel legal issues raised," is meritless. The statute at issue is not new, having been in effect since April 9, 2011, as the plaintiffs point out. The statute imposes, on the employer, specified and maximum damages for violating the notice and statement requirements, leaving nothing to the plaintiffs' counsel but to determine the number of weeks the violation(s) occurred. Since the plaintiffs alleged that the defendants never provided any notices as required, effective April 9, 2011, and the complaint was filed in April 2013, it was apparent that even one year of violations (52 weeks) since April 9, 2011, would result in damages that exceed the maximum allowed by the statute. Accordingly, it was apparent,

without doing any math, that damages cannot exceed twenty-five hundred dollars under each provision. Thus, the Court is at a loss respecting what precisely the plaintiffs' counsel had "to interpret" in connection with the statutory provisions at issue and what the relevance is of how "widely litigated" these provisions might have been.

The plaintiffs also contend that this case is complicated because of "the difficulty of gathering evidence from non-English speaking low-wage workers." The plaintiffs did not describe the nature or extent of the alleged difficulty and how much time and what kind of effort it took them to gather "evidence from non-English speaking low-wage workers," or the number of those individuals or the amount of documents gathered. In light of the plaintiffs' contentions that: (a) the "Named Plaintiffs gathered information from their current and former co-workers about other people's experiences and provided that information to Class Counsel"; (b) Abrahamson "translated the retainer from English to Spanish"; and (c) "a paralegal fluent in Spanish reviewed the retainer to ensure that the translation was accurate," the Court finds that the plaintiffs' contention, that this case is complicated because of the difficulty in gathering evidence due to any language barrier, is meritless. Moreover, the Court does not understand the relevance of the fact that the plaintiffs are "low-wage" workers to the gathering of the documents.

The Court has conducted a searching assessment of the record in this case, including the plaintiffs' billing records. The Court finds that this action is a simple and straightforward action for violations of FLSA and NYLL, involving a single category of plaintiffs, delivery workers at the defendants' restaurants. The plaintiffs contend that their counsel "reviewed previous wage and hour complaints against similar employers and revised and updated certain legal sections of those complaints, to be used as part of the Complaint." The plaintiffs' counsel, representing themselves as having "significant experience prosecuting wage and hour class and collective actions such as this one," were able to utilize sections from the previous complaints to draft the instant complaint. Between counsel's experience and background and their ability to utilize previous complaints in drafting the instant complaint, the Court finds that the number of attorneys and the number of hours expended drafting, editing and revising the complaint was excessive, duplicative and unnecessary.

The Court's review of the billing records indicates unjustified and unnecessary duplication of work, apart from duplicative work in connection with the complaint. For example, three consent forms have been filed in this action by the plaintiffs. *See* Docket Entry Nos. 3–1, 7 and 17. The consent forms contain standardized text [5] the plaintiffs' counsel used in other wage

---

5. The following is the text of the plaintiffs' consent in the English and Spanish languages: I consent to be a party plaintiff in a lawsuit against Chop't Creative Salad Company LLC and/or related entities and individuals in order to seek redress for violations of Fair Labor Standards Act, pursuant to 29 U.S.C. § 216(b). I hereby designate Outten & Golden LLP and the Lee Litigation Group, PLLC to represent me in such a lawsuit.

Doy mi consentimiento para ser parte demandante en una demanda contra against Chop't Creative Salad Company LLC y/ o entidades e individuos relacionados con el fin de obtener reparación por violaciones de la Fair Labor Standards Act, (*Ley de las Normas Laborales Justas* ) de conformidad con 29 U.S.C. § 216(b). Por la presente yo designo Outten & Golden LLP y Lee Litigation Group, PLLC para representarme en tal demanda."

and hours class action litigations, previously, in this court, *see e.g., Benavidez v. Plaza Mexico, Inc.,* 09–CV–5076, Docket Entry No. 88–1,[6] which is accompanied by a Spanish language translation of that text. The billing records indicate numerous entries concerning this simple and short statement of consent form, including: "Draft consent form," "Correspondence with co-counsel re consent to join form," "Conference with SJA re consent forms and complaint filing," "Conference with SJA re consent to join forms and filing complaint," "Redact and finalize consent form," "Update consent forms," "Draft notice of filing consent," "Edit notice of consent to join and correspondences with FWD and MB re filing," "Redraft notice of consent," "File consents via ECF," "Review notice of consent filing," "Review consent form," and "Redact and File Consent." Since the English and Spanish text of the consent forms in this action is identical to the English and Spanish text of the consent forms in at least one of counsel's previous actions, the Court is at a loss in trying to understand why counsel expended any time drafting, conferencing, redacting, updating, redrafting and reviewing consent forms, except to edit the plaintiffs' names and substitute the name of OG's co-counsel in this action.

Counsel contends that "O & G carefully monitors and controls the quality control of everything that is submitted to the Court. For this reason, a partner always reviews and edits the drafts produced by associates," and "as part of O & G's quality control measures, a partner reviews all documents after they have been filed on ECF." However, the plaintiffs' submissions do not evidence care in counsel's quality control process. For example, even the short statement of consent, which was reviewed, edited and redrafted at various times, contains a glaring error in the Spanish language version, where an English language word is included next to the Spanish language word: "Doy mi consentimiento para ser parte demandante en una demanda contra **against** Chop't Creative Salad Company LLC. . . ." The plaintiffs' consent forms were filed on April 22, May 6 and August 12, 2013, and, despite counsel's quality control and numerous reviews of each consent form at different times, the error remained on all consent forms filed. Similarly, counsel did not notice, when conducting their quality control, that Swartz's June 9, 2014, declaration in support of the plaintiffs' motion for attorney's fees had incorrect paragraph numbering. On the contrary, the error was compounded, since Lee's June 9, 2014 declaration, which, in large part, contains paragraphs identical to those in Swartz's declaration, also contains the paragraph numbering error, starting precisely at the same place as the error in Swartz's declaration, immediately following paragraph 36. Counsel's contention about quality control is suspect, because the alleged quality control fails even in the very sentence claiming it: "In an effort to submit polished documents to the Court, O & G's

---

6. The following is the text of the plaintiffs' consent in *Benavidez v. Plaza Mexico, Inc.*: I, consent to be a party plaintiff in a lawsuit against Plaza Mexico Inc., Mama Mexico and/or related entities and individuals in order to seek redress for violations of Fair Labor Standards Act, pursuant to 29 U.S.C. § 216(b). I hereby designate Fitapelli & Schaffer, LLP and Outten & Golden LLP to represent me in such a lawsuit.

Doy mi consimiento para ser parte demandante en una demanda contra Plaza Mexico Inc., Mama Mexico y/ o entidades e individuos relacionados con el fin de obtener reparación por violaciones de la Fair Labor Standards Act, (*Ley de las Normas Laborales Justas* ) de conformidad con 29 U.S.C. § 216(b). Por la presente yo designo Fitapelli & Schaffer, LLP y Outten & Golden LLP para representarme en tal demanda.

practice is to have attorneys who did not draft the briefs edit and cite check of [sic] the briefs prior to submitting them to the Court."

The Court finds disingenuous counsel's contention, such as this: "In addition, as part of O & G's quality control measures, a partner reviews all documents after they have been filed on ECF. I therefore reviewed the filed Complaint 'as filed' and corresponded with Ms. Abrahamson about it on April 16, 2013." Counsel does not explain and it is not clear what remains to be "corresponded" about the complaint after it is filed, subsequent to numerous, unnecessarily duplicative revisions, editions and reviews, or what the purpose, if any, such correspondence might have.

The Court's review of the billing entries revealed that a large amount of time was spent duplicating work that was neither justified nor necessary in this simple and straightforward action, in which the parties reached a settlement agreement in August 2013, only four months after the complaint was filed. The Court finds that the number of personnel used to work on this action is not justified given its simple and short nature, the very limited discovery that occurred and the limited labor and time that was required to reach resolve. Moreover, the billing records indicate entries for time expended performing other than legal work, such as translating, for which no evidence of the translator(s) qualification to perform that work was demonstrated, and the plaintiffs do not make citation to any binding authority qualifying translation services as legal work. Similarly, the plaintiffs did not explain why or how "administering this class settlement will likely require an ongoing commitment," including responding to "Class Member inquires after final approval, especially after checks are issued," what remains to be done besides making

payments in this action, or what inquires class members may have after checks are issued to them. These contentions are meritless. For all the above reasons, the amount of time and labor claimed by counsel in this action are excessive and do not support the percentage requested for counsel's fees.

*Litigation's Magnitude and Complexity*

With respect to the magnitude and complexity of the litigation, the plaintiffs contend: that "Courts have recognized that wage and hour cases involve complex legal issues," and

> [t]his case hinged on several mixed questions of fact and law. In particular the parties disputed the facts surrounding the job duties of the delivery workers whom Plaintiffs alleged were improperly paid the tipped minimum wage under the FLSA and state law. These mixed factual and legal questions support approval of Class Counsel's attorneys' fee request.

Although the plaintiffs contend that courts have recognized that wage and hour cases involve complex legal issues, they do not contend that their case involves such "complex" legal issues; rather, they content their case "hinged on several mixed questions of fact and law." However, the plaintiffs provide only one example they believe involves mixed questions of fact and law, notwithstanding their assertion that "[t]hese mixed factual and legal questions support approval of Class Counsel's attorneys' fee request." That the instant case might involve mixed questions of fact and law, without more, does not say anything about the magnitude and complexity of the litigation, since cases usually involve mixed questions of fact and law, and that fact alone is not of particular relevance or significance for the instant analysis. The plaintiffs do not provide any further explanation that might suggest the magnitude

or the level of complexity of this litigation. Based on the record and the plaintiffs' submissions on this motion, the Court finds that the magnitude and complexity of the litigation factor does not support the plaintiffs' fee request.

### Risks of the Litigation

Concerning the risks of litigation, the plaintiffs assert the following risks that would present "hurdles to a successful recovery": (1) "Plaintiffs would have to overcome Defendants' defense that they were entitled to take a tip credit because Plaintiffs and Class Members did not spend more than 20 percent or two hours of their workday engaged in non-tip producing 'side work'"; and (2) "the Court would not grant conditional certification under Section 216(b) of the FLSA or class certification under Rule 23, and such a determination would likely be reached only after extensive briefing." Although a risk existed that the defendants would claim their entitlement to take a tip credit based on the nature of the plaintiffs' work, that risk is related solely to the amount of the plaintiffs' damages in case the plaintiffs prevail, not to the plaintiffs' success in this litigation. Similarly, the risk of the denial of class certification, while it had the potential to affect the nature of the action, is not necessarily related to the success of the plaintiffs on their claims. "[I]n any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.1972). The Court recognizes that the risks plaintiffs' counsel undertook in litigating this case are inherent in any litigation, including wage and hours litigation, but those risks are not significant or particular in any significant way in the circumstance of this case. Thus, this factor is neutral and does not militate for or against the percentage requested for attorneys' fees.

### Quality of Representation

According to the plaintiffs, 350 class members have been identified and each class member will receive "approximately $1,454.52," which is a reasonable settlement amount, negotiated by counsel with "substantial experience prosecuting large-scale wage and hour class and collective actions," and counsel's skills and experience are "directly responsible for the favorable settlement and weigh in favor of granting the requested fees." Swartz stated that he has represented employees in employment-law actions since 1998. He also provided information about other members of OG who billed hours in this action, although for some of them Swartz provided no information about their work experience. For example, Swartz contended that Bien has been an OG partner since 2006, but said nothing about her skills or experience. He asserted that Brooks has been of counsel to OG since 2008, but only informed that she practiced labor and employment law prior to joining OG, while being silent about her experience at OG. It is not clear how Swartz has "personal knowledge" of the OG members' experiences prior to joining OG, since he did not state that he worked with any of them outside of OG. Similarly, Swartz said nothing about the experience at OG of the following individuals: Turner, Trzinski, Scimone, Abrahamson, Aaron, McNerney and Swain. In fact, Swartz mentioned no experience whatsoever for Bien, except for her clerkship with the United States Court of Appeals for the Ninth Circuit, no litigation experience for Aaron, and no experience for McNerney and Swain. Concerning support staff, Swartz mentioned how

long each person worked at OG, where each went to school and where each worked prior to joining OG. Lee stated in his declaration that he is an LLG partner, who prosecutes primarily wage and hour class and collective action cases. He stated that Selig and Hahn specialize in employment law, without further elaboration.

Based on the record before the Court and the Court's familiarity with OG and LLG's litigation in this and other actions, as well as the simple and straightforward nature of this action and the result achieved, the Court finds that counsel's representation of the plaintiffs was adequate. However, the paucity of information about counsel's skills and experience prevents the Court from assessing reasonable rates and hours under the lodestar method for the purpose of cross-checking the percentage method. Notwithstanding this deficiency, the Court finds that this factor militates in favor of the requested fees, albeit very slightly.

*Requested Fee In Relation to the Settlement*

The plaintiffs request "33.3% of the Settlement Fund" as attorneys' fees, contending that courts "routinely" grant such requests in cases with similar or substantially larger settlement funds, and that lowering the percentage is not warranted because no windfall to the plaintiffs' counsel will ensue, such as may be the case in "megafund" actions. The Court notes that the percentage of the settlement fund requested as a fee is often granted by courts in cases with similar settlement awards. However, a windfall for the plaintiffs' counsel may occur in an action not involving a "megafund," and this case must be assessed based on its unique circumstances; what other courts "routinely" grant is not in itself sufficient to find that the requested percentage is reasonable in this case. Thus, this factor is neutral.

*Public Policy Considerations*

██ The Court is not only "mindful that public policy supports the pursuit of meritorious class action litigation," but also of the "longstanding concern for moderation." *McDaniel,* 595 F.3d at 426.

However, there is reason to be wary of much of the caselaw awarding attorney's fees in FLSA cases in this circuit. Struck by extreme similarities in the wording of several decisions, this Court discovered that many of the authorities cited by Plaintiff's counsel in support of their fee application are in fact proposed orders drafted by the class action plaintiffs' bar and entered with minimal, if any, edits by judges. Indeed, [in] each of the four decisions, mentioned [in this case], the same authorities Plaintiffs cited in their brief, were proposed orders making findings of fact and conclusions of law drafted by plaintiffs' counsel requesting their own fees.... Orders drafted by counsel, especially those making findings of fact and conclusions of law that award counsel their own fees, should be given little precedential value. By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to. Because Westlaw and Lexis sweep every order of any significance into their databases, these form orders appear as if they were decisions by the judges who signed them. No wonder that "caselaw" is so generous to plaintiffs' attorneys. *Fujiwara,* 58 F.Supp.3d at 435–37, 2014 WL 5840700, at *7–8.

In this case, the plaintiffs' counsel submitted a proposed order that includes approval of the requested attorney's fees. In that proposed order, as well as in the plaintiffs' memorandum of law in support of the fee application, counsel relies and

makes citation, almost exclusively, to their own previous cases: *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y.2008) (appointing OG and Locks Law Firm, PLLC as class counsel); *Sewell v. Bovis Lend Lease, Inc.*, No. 09 Civ. 6548, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012) (approving one-third of the settlement fund as OG's attorney's fees); *Sanjaya v. Inakava USA. Inc.*, 12 CV 4500 (S.D.N.Y. Apr. 17, 2013) (awarding 33.3% of the settlement fund as attorney's fees to LLG); *Yuzary v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693, 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) (awarding 31.7% of the settlement fund as attorneys' fees to OG, Fitapelli & Schaffer, LLP, Lee Litigation Group, PLLC and Shavitz Law Group, P.A.); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013) (awarding 33% of the settlement fund as attorneys' fees to OG & Shavitz Law Group, P.A.); *McMahon v. Olivier Cheng Catering & Events, LLC*, 08 Civ. 8713, 2010 WL 2399328 (S.D.N.Y.2010) (awarding 33% of the settlement fund as attorney's fees to OG); *Hernandez v. Merrill Lynch & Co., Inc.*, 11 Civ. 8472, 2013 WL 1209563 (S.D.N.Y. March 21, 2013) (awarding 33% of the settlement fund as attorneys' fees to OG & Shavitz Law Group, P.A.); *Sand v. Greenberg*, 08 Civ. 7840, 2010 WL 69359, at *3 (S.D.N.Y. Jan. 7, 2010) (stating, in an offer of judgment wage and hours case litigated by OG, that attorney's fees are meant "to encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel."); *Diaz v. Eastern Locating Serv. Inc.*, No. 10–cv–4082, 2010 WL 5507912 (S.D.N.Y. Nov. 29, 2010) (awarding one-third of the settlement fund as attorneys' fees to OG, Lee, Braziel, LLP & Burr & Smith, LLP); and *Massiah v. MetroPlus Health Plan, Inc.*, 11–cv–5669, 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012) (awarding 30% of the settlement

fund as attorney's fees to OG). Most of these cases, litigated previously by counsel in this action, involve approval of the attorney's fees based on the proposed orders drafted by counsel and signed by the courts, which are almost identical to the proposed order submitted by counsel in the instant action. *See, e.g., Yuzary*, 2013 WL 5492998. Moreover, memoranda of law in support of the fee requests in cases litigated previously by the plaintiffs' counsel are also almost identical to the memorandum of law in support of the instant request. *Compare, e.g., Beckman*, 293 F.R.D. 467, Docket Entry No. 20, with Docket Entry No. 47 in the instant case. The plaintiffs' counsel apparently had "the benefit of 'piggybacking' off of … previous case[s]," *see Wal–Mart Stores. Inc.*, 396 F.3d at 122, making suspect: (i) the time and labor claimed to have been expended in this action, especially with respect to legal research; and (ii) the basis on which the courts "routinely" grant the same percentage of the settlement fund as attorney's fees in similar actions. The Court notes that the practice of the plaintiffs' counsel about which the *Fujiwara* court was wary is also present here, and the Court is similarly wary of it. For the reasons described above, the Court finds that public policy considerations, in this case, do not militate in favor of the requested attorneys' fees.

Upon a searching assessment of the record and the plaintiffs' submissions on their motions and for the foregoing reasons, the Court finds that the plaintiffs' request for an award of "33.3% of the Settlement Fund," as attorneys' fees, is not warranted. The Court finds that 20% of the $800,000 settlement fund, namely, $160,000, represents reasonable attorneys' fees in the circumstance of this action. The Court approves, as reasonable, the

plaintiffs' request for $5,516.14 in out-of-pocket expenses.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for certification of the settlement class, final approval of the class action settlement and approval of the FLSA settlement, Docket Entry No. 40, is granted. The plaintiffs' motion for approval of service awards, Docket Entry No. 44, is denied. The plaintiffs' motion for approval of attorneys' fees and reimbursement of expenses, Docket Entry No. 46, is granted, as explained above: (a) 20% of the settlement fund, namely $160,000, are awarded as reasonable attorneys' fees; and (b) $5,516.14 are awarded for costs incurred by the plaintiffs in litigation this action. The Clerk is directed to enter final judgment and close the case.

SO ORDERED.